IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIDDIE ACADEMY DOMESTIC
FRANCHISING, LLC
    *Plaintiff,*

    v.

WONDER WORLD LEARNING, LLC, et al.
    *Defendants.*

Civil Action No. ELH-17-3420

## MEMORANDUM OPINION

Plaintiff Kiddie Academy Domestic Franchising, LLC ("Kiddie" or "Kiddie Academy")

has sued defendants, Wonder World Learning, LLC ("Wonder World" or "WWL"), its former

franchisee, and the franchisee's principals, Sumanth Nandagopal ("Mr. Nandagopal") and Supriya

Sumanth ("Ms. Sumanth"). The suit alleges trademark and copyright infringement, breach of

contract, breach of guaranty, and seeks a declaratory judgment. ECF 1 (the "Complaint").[1]

Several exhibits are appended to the suit, including the Franchise Agreement between Kiddie and

WWL, signed in March 2014 (ECF 1-1 at 59), and the Personal Guaranty executed on March 6,

2014, by Ms. Sumanth and Mr. Nandagopal, who are husband and wife. ECF 1-1 at 64; ECF 1,

¶3.[2]

---

[1] The case was originally assigned to Judge Marvin J. Garbis. It was reassigned to me on November 14, 2018, due to the retirement of Judge Garbis. *See* Docket.

[2] It appears that Mr. Nadagopal and Ms. Sumanth adhere to naming customs that are culturally different from those typically observed in the United States. *See* ECF 27-1 at 5 n.1. Because they share the name "Sumanth" in common, when I refer to them collectively, I shall sometimes do so as the "Sumanths." *See* ECF 27-1 at 5 n.1. I also refer to them variously as the "Guarantors" or the "couple." And, along with WWI, I refer to them collectively and interchangeably as defendants or counterclaimants.

Kiddie "owns a national educational child care franchise system . . . ." ECF 1 at 2. WWI opened a Kiddie franchise in Texas on August 15, 2015. WWI and the Guarantors allegedly defaulted on their financial obligations under their Franchise Agreement, and have refused to return copyrighted materials. ECF 1.[3]

Defendants filed a combined answer to the suit and a counterclaim and third-party complaint. ECF 22. Plaintiffs moved to dismiss. ECF 23. However, Judge Garbis, to whom the case was then assigned, permitted defendants to amend, by Order of April 27, 2018. ECF 24. Thereafter, defendants filed an Amended Counterclaim and Amended Third-Party Complaint ("Amended Counterclaim"). ECF 25. In particular, they filed a counterclaim against Kiddie Academy and a third-party complaint against Greg Helwig, Kiddie's President and Chief Executive Officer; Lene Steelman, Kiddie's Controller/Vice President ("VP") of Accounting; Joshua Frick, Kiddie's VP of Real Estate; David Gould, Kiddie's former Development Manager; Susan Wise, the Chief Financial Officer and Chief Operating Officer; Kevin Murphy, the VP of Operations; Chris Commarota, the VP of Construction; Anthony F. Malizia, former Construction Manager; and William Huggins, Franchise Business Consultant.

The Amended Counterclaim contains ten counts under federal and Maryland law. ECF 25. Count One asserts a claim of "(Intentional Misrepresentation) Fraud or Deceit" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 62-67. Count Two alleges a claim of

---

[3] Subject matter jurisdiction is founded on diversity of citizenship, pursuant to 28 U.S.C. § 1332, as well as federal question and supplemental jurisdiction, under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. ECF 1, ¶ 4. Kiddie is a Delaware corporation with its principal place of business in Maryland. The Guarantors are domiciled in Texas, where they operated a Kiddie franchise. *Id.* ¶ 3. And, WWL is a limited liability company formed under the laws of Texas. *Id.* ¶ 2.

There is no challenge to personal jurisdiction. *See* ECF 1, ¶ 5; ECF 1-1 (Franchise Agreement) at 56, ¶ 27.2.

"(Fraud in the Inducement)" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 68-70. Count Three asserts a claim of "(Intentional Misrepresentation) (Concealment or Non-Disclosure)" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 71-81. In Count Four, counterclaimants assert a "Negligent Misrepresentation" claim against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 82-88. Count Five, lodged against Kiddie, Commarota, Malizia, and Huggins, asserts "(Defamation Per Se of a Private Individual) Supriya Sumanth." *Id.* ¶¶ 89-92. Count Six contains a claim of "Detrimental Reliance" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 93-96.

Counts Seven, Eight, and Nine allege violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy, based on mail fraud and wire fraud. *Id.* ¶¶ 97-114. In Count Ten, also under RICO, counterclaimants allege that Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). *Id.* ¶¶ 115-20.

Kiddie has moved to dismiss the Amended Counterclaim, pursuant to Fed. R. Civ. P. 12(b)(6). Fed. R. Civ. P. 12(b)(6). ECF 27. The motion is supported by a memorandum of law (ECF 27-1) (collectively, the "Motion") and an exhibit. *See* ECF 27-2 (the "Franchise Agreement"). Kiddie contends that contractual and statutory limitations bar all but one count. ECF 27-1 at 10-16. Alternatively, Kiddie argues that counterclaimants fail to state a claim as to all counts. *Id.* at 16-39. Counterclaimants oppose the Motion (ECF 30, the "Opposition"), to which Kiddie has replied. ECF 31 (the "Reply").

According to the Docket, the third-party defendants were never served. Pursuant to Fed. R. Civ. P. 4(m), the counterclaimants were required to serve the third-party defendants within 90

days of filing the counterclaim, *i.e.*, by June 24, 2018.[4] If any defendant is not served within that time, "the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." *Id.*

In view of the foregoing, I shall dismiss the claims against the third-party defendants, without prejudice. Therefore, I shall consider the Motion only with regard to the Amended Counterclaim filed by the defendants.

No hearing is necessary to resolve the Motion. *See* Local Rule 105(6). For the reasons that follow, I shall grant the Motion.

## I.     Factual Background[5]

The Guarantors, husband and wife, "began researching child care franchise companies" in January 2011. ECF 25, ¶ 16. They sought a company "that would provide knowledge and support for inexperienced owner operators" because they are not "sophisticated investors." *Id.* In February 2011, the Guarantors submitted a franchise application to Kiddie Academy. *Id.* ¶ 17. Kiddie was the "first and only franchisor" that the couple "had ever purchased." *Id.* ¶ 18. At the time, the Guarantors "were not familiar with the laws or with the practices of franchisors." *Id.*

Gould, who then served as Kiddie's Director of Franchise Sales, spoke with the couple on the phone and provided them an overview of the franchise. *Id.* But, he indicated that he would disclose additional details after they "complete sign [sic], and return to him a document called a preliminary questionnaire and personal financial statement." *Id.* ¶ 17. After the Guarantors

---

[4] "[W]ith one exception" not relevant here, "the requirements for valid service of process and the acquisition of personal jurisdiction in a third-party action are the same as they are in any other type of litigation." Alan WRIGHT & ARTHUR MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 1445 (3d ed.).

[5] In light of the posture of the case, I shall assume the truth of the facts alleged in the Amended Counterclaim.

completed the requisite paperwork, "Gould consulted with Wise." *Id.* ¶ 19. Gould then told the couple that in order "to qualify for a bank loan" they "would need to increase their net worth on their personal financial statement." *Id.*

Between February 24, 2011 and May 9, 2011, Gould told the Guarantors that the "site selection process takes anywhere from 3 to 9 months, and that when sites are selected that the Real Estate Manager provides a Site Analysis Report . . . ." ("SAR" or "Report"). *Id.* ¶ 21. The SAR "would tell [the applicants] if the site would support a daycare business from the demographics, and competition compared to the number of pre-school age children in the area." *Id.*

The counterclaimants allege that Frick, the VP of Real Estate, "intentionally withheld important information from [them] as to the time it actually could take Franchisees to find sites." *Id.* ¶ 21. Further, the Sumanths allege that they "reasonably relied on Frick's representations to their detriment and reasonably believed that their experience was unusual for Kiddie." *Id.* They assert that it was not until several years later that they learned from other franchisees that it was "quite common for site selection to take two or three years or longer, a fact known to Kiddie." *Id.* ¶ 22.

On or about May 9, 2011, the Guarantors visited Kiddie's corporate office in Maryland. *Id.* ¶ 20. Steelman, Kiddie's VP of Finance, advised the Guarantors that "she would help them produce the financial documents that lenders would require for approval of their loan application and would also provide bookkeeping training and support through her department." *Id.* ¶ 23.

Commarota, the VP of Construction, also advised the Sumanths that Kiddie Academy would assist them in finding and interviewing architects and contractors and "in reviewing construction plans for new construction to retrofit an existing space." *Id.* ¶ 24. Further, Commarota told them "not to worry because 'his team' would guide them through the entire

construction process." *Id.* However, the Guarantors "did not choose Kiddie's preferred vendors[.]" *Id.* ¶ 25. Thereafter, according to the counterclaimants, Kiddie provided only "minimal" support and its representatives "acted in a hostile manner" towards the couple. *Id.*

In its marketing, Kiddie allegedly advised the Guarantors "that its school curriculum was as good or better than its best competitor . . . ." *Id.* ¶ 26. Additionally, Kiddie's "marketing department stated that its education department would conduct owner and director training and continue to provide training as needed" for the franchise. *Id.* Moreover, Murphy, the VP of Operations, promised to "appoint a Franchise Business Consultant to provide ongoing operational support." *Id.* ¶ 27. However, counterclaimants allege that Kiddie's designated consultant, Will Huggins, "had no franchise experience, no experience in operating or managing a business, and no experience, training or knowledge with daycare centers or pre-school education and had never managed people in a supervisory role[.]" *Id.* According to counterclaimants, before Huggins joined Kiddie, he was a "Sales Consultant with a publishing house in Florida[.]" *Id.* And, he did not "know the local Texas market" because he was based in Maryland and had never lived in Texas. *Id.* Further, they assert that they reasonably relied, to their detriment, on Kiddie's representations. *Id.*

Further, the counterclaimants allege that Helwig and Wise "falsely assured" the Guarantors that "their lack of industry experience would not be an issue due to Kiddie's proven curriculum, marketing, and support from all Kiddie's departments." *Id.* ¶ 28. Kiddie and the third-party defendants also told the Sumanths that Kiddie had "a platform which would guide them to success." But, according to the counterclaimants, no such platform existed. *Id.* Moreover, after defendants opened the Franchise on August 15, 2015, "they received no material support from Kiddie." *Id.* ¶ 27. Defendants also claim that Kiddie's "department heads" withheld "specific

information" on the performance of other Kiddie franchisees. *Id.* ¶ 29. They insist that if they had known of the withheld information, they would not have opened a franchise. *Id.* In addition, counterclaimants contend that Kiddie provided false information regarding the time it would take defendants' franchise "to become profitable," and "materially understated payroll expenses and property taxes and the enrollment numbers it would take to do so." *Id.* ¶ 30.

Counterclaimants allege that between May 9, 2011, and June 12, 2011, "Kiddie set up weekly calls" to encourage the Guarantors to sign a "Preliminary Franchise Agreement." *Id.* ¶ 32. During these calls, the Guarantors "expressed their main concerns regarding their lack of experience in owning and operating a child care business." *Id.* Nevertheless, Kiddie purportedly assured them that their "lack of knowledge and experience would not be an issue" because the company would provide "step by step guidance" and other assistance. *Id.*

On June 12, 2011, Kiddie and WWL executed a "Preliminary Franchise Agreement" (ECF 27-2), guaranteed by the Sumanths. Defendants paid Kiddie "a first installment" of $20,000 toward Kiddie's total franchisee fee of $120,000. *Id.* ¶ 31. Immediately upon signing the Agreement, defendants were contacted by Bill Fitzgerald, Kiddie's Real Estate Manager, to assist them in "finding a location for their Kiddie Academy" and in deciding whether to own or lease their space. *Id.* ¶ 33. Fitzgerald also informed the Guarantors that he would set up a call with Kiddie's commercial broker, who "would begin showing properties that would support the franchised business." *Id.* ¶ 34.

In addition, Fitzgerald introduced the couple to Steelman, the VP of Accounting, who arranged "a training call on how to prepare their business pro forma for the lender." *Id.* Steelman told them "that a final version of the pro forma would be used when Steelman sent [the

Guarantors'] loan to lenders for approval, along with a business plan and a list of supporting documents she was requesting they gather together." *Id.* ¶ 35.

With some assistance from Kiddie, the Guarantors searched for an appropriate location in and around San Jose, California, where they then lived. *Id.* ¶ 36. Despite a search that lasted over two years, the couple found no acceptable sites. *Id.* After Kiddie advised defendants to consider the "booming" Texas market, the Guarantors narrowed their search to Austin, Texas. *Id.* ¶ 37. Kiddie's real estate group assisted the couple in their site selection and provided the SAR. *Id.* ¶ 38. According to the Amended Counterclaim, Kiddie told the couple that the Report was "accurate" and provided "all the information necessary to making an informed decision as to where to set up their Kiddie Academy franchise." *Id.*

On August 8, 2013, Frick advised defendants that they would need to amend their Preliminary Franchise Agreement to change their designated area to Austin, Texas. *Id.* ¶ 39. In November 2013, Kiddie approved a site in Cedar Park, Texas, a suburb of Austin. *Id.* ¶ 27. The next month, Steelman introduced the couple to Lisa Conley, Kiddie's Finance Manager, "who they were told would help [them] to close on the loan that Steelman secured for them." *Id.* ¶ 41.

Defendants paid a second installment of franchisee fees on March 14, 2014, in the amount of $50,000. *Id.* ¶ 40.

On or about April 1, 2014, Evolve Bank, "a preferred lender of Kiddie," rejected the Guarantors' loan application. *Id.* ¶ 42. The Bank allegedly rejected the loan because "study of the local market revealed too many competitors" and insufficient "need/demand for an additional childcare facility." *Id.* However, in an email dated March 24, 2014, Frick purportedly told the Sumanths that Evolve Bank "had done insufficient research." *Id.* ¶ 44.[6] Counterclaimants allege

---

[6] Curiously, the date of the email precedes the date of the bank's loan rejection.

that this assertion was false, and Frick and Kiddie "misrepresented the reason for Evolve Bank's rejection of the site." *Id.*

By this point, defendants had already spent over $200,000 on "nonrefundable franchisee fees, deposits, and fees for the due diligence of their site[.]" *Id.* ¶ 43. Then, Kiddie found another lender, Square 1 Bank in North Carolina. *Id.* ¶ 45. The couple used "the pro formas as prepared with" Conley's assistance, and the loan was approved on April 17, 2014. *Id.* ¶ 46.

Counterclaimants allege that they had "no experience in commercial construction" and therefore relied on Kiddie's construction department. *Id.* ¶ 49. During the construction process, the construction team allegedly made numerous, "significant errors." *Id.* ¶ 50. According to the defendants, these mistakes should not have been made by anyone "familiar with the construction of child care and early childhood education centers, as Kiddie and its management claimed they were[.]" *Id.* ¶ 47.

For example, counterclaimants assert that Kiddie incorrectly budgeted for the playground area's "splash pad." *Id.* ¶ 50. Although Kiddie initially estimated $8,000 for a splash pad, it "had no splash pad vendors," and the price was ultimately $40,000. *Id.* When the Sumanths sought the city's approval for the playground installation without the splash pad, the city inspector advised that they "would have to get re-permitted to redesign the playground without a splash pad." *Id.* ¶ 51. Kiddie had not advised the couple of this permitting issue. *Id.* As a result, the Sumanths operated their franchise without a playground for two months after its opening. *Id.*

Additionally, when Malizia inspected the site on June 6, 2015, and again on July 23, 2015, he did not advise the defendants or anyone else that "standard licensing requirements were missing from the construction and design, including, but not limited to, the handwashing sink in the infant room, the glass window cut-outs in the infant nap area, children's toilets in the toddlers and

playground areas, and a diaper changing station in the two year old classroom which remained an operational and supervisory challenge." *Id.* ¶ 53.

According to the Counterclaim, Kiddie had a relationship only with one architect, Sam Baker. *Id.* ¶ 52. Baker's architectural proposal cost significantly more than the projected budget. *Id.* As a result, the defendants chose another architect. In response, Kiddie stopped cooperating "on the build-out of their Kiddie Academy site." *Id.*

The Amended Counterclaim alleges that during construction meetings, at which the couple was not present, Malizia repeatedly referred to Ms. Sumanth as a "liar" and as "dishonest in her business practices." *Id.* ¶ 48. He also repeatedly laughed at the Sumanths "whenever their franchise came up during these meetings[.]" *Id.* Commarata said that Ms. Sumanth would "regret her decisions to use another architect" and "was not knowledgeable enough to manage her project." *Id.* ¶ 48. He purportedly made these same statements to former Kiddie employees, including Conley, Magus, and Kori Wilson. *Id.; see also id.* ¶ 91. The defendants assert that they did not learn of these statements until April 2017. *Id.*

On April 20, 2015, Kiddie required the couple to travel to Kiddie's corporate office in Maryland for training. *Id.* ¶ 54. There, Murphy, the VP of Operations, allegedly warned the Sumanths that the "pro-forma and budget that Kiddie instructed [them] to use in applying for the loan and planning for in their operation of their Kiddie Academy franchise were very aggressive, and overly optimistic." *Id.* At the same meeting, Conley advised the defendants that "the numbers provided to the bank at Kiddie's direction barely met the minimum lending guidelines for approval, and that it was imperative that [they] receive the support from Kiddie to reach the given projections." *Id.*

The Guarantors "asked Murphy to see Kiddie's historical numbers to better understand why Murphy would take the position that [the] numbers that Kiddie told them to use were 'very aggressive, and overly optimistic.'" *Id.* ¶ 55. However, counterclaimants allege that Murphy refused to share this information "due to 'proprietary reasons.'" *Id.*

According to the counterclaimants, Kiddie told the couple that it "would be present for the interviews of candidates for the franchise's 'Director', as this was the most important role in the franchise." *Id.* ¶ 56. But, Kiddie did not help in hiring a director. *Id.* Indeed, Kiddie allegedly "refused to send a representative for the interviews, claiming it changed its policy, but would only participate in the process telephonically." *Id.*

Defendants opened their Kiddie Academy franchise on August 15, 2015. *Id.* ¶ 27. According to the Amended Counterclaim, following the opening, defendants "received no material support from Kiddie." *Id.*

By July 2016, defendants "realized that their ramp up to break even had not occurred as Kiddie had projected and their working capital would be consumed over the next six months." *Id.* ¶ 57. They claim that they asked Helwig, Kiddie's CEO, for an action plan to help them "reach their break-even point" before exhausting the remainder of "their working capital." *Id.* Defendants insist that Kiddie declined to provide this assistance and made "personal attacks" against them. *Id.*

Counterclaimants further allege that during a telephone call on February 2, 2017, Helwig "threatened" defendants "with a wage garnishment and lawsuit" if they sued Kiddie. *Id.* ¶ 57. Helwig also "revealed" that Kiddie "had many franchisees who had experienced slower than projected" ramp-ups and that "Kiddie had prepared action plans" that those franchisees "implemented" and they "became successful." *Id.* ¶ 60.

In April 2017, Conley purportedly told the Guarantors that "Kiddie had never revealed true numbers to its franchisees[.]" *Id.* ¶ 61. She also told them that "she had won an employment lawsuit against" Kiddie and that "one of the reasons for her resigning was she was forced to change enrollment numbers for all franchisees on their proforma." *Id.*

That same month, the Guarantors learned from other franchisees, including Patrick Paul in New Jersey, that "Kiddie had not provided them promised support, had knowingly instructed them to apply for a government insured loan through the Small Business Administration, and given them false and misleading franchise projections and information through the wires and mail that could not be supported through Kiddie's known historical data." *Id.* ¶ 58.

In addition, counterclaimants allege, *id.* ¶ 80: "Kiddie intimidated and threatened other franchisees who discussed the fraudulent behavior by Kiddie in dealing with them." According to the Amended Counterclaim, Kiddie's "pattern of intimidation continues to this day" and "[o]ther franchisees are afraid to discuss the false and incomplete material information they also got from Kiddie." *Id.*

## II.    Standard of Review

### A.    Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable Defined Benefit Pension Fund Plan v. Weil*, ___ F.3d ___, 2019 WL 1105179, at *3 (4th Cir. Mar. 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted). The rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Put another way, "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must

set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 423 (2018); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*,

745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*); *see Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak*, 780 F.3d at 606 (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb*, 791 F.3d at 508.

In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166; *see also* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Paradise Wire & Cable, supra*, 2019 WL 1105179, at *4. However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citation omitted); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Counterclaimants did not attach any exhibits to their Amended Counterclaim. But, Kiddie attached the Franchise Agreement to its suit (ECF 1-1) and to its Motion (ECF 27-2). The

Franchise Agreement is integral to the Amended Counterclaim and is referenced repeatedly. ECF 25, ¶¶ 31, 32, 39, 63, 65, 83. Therefore, I may consider the Franchise Agreement.

## B. Rule 9(b)

To the extent that the Amended Counterclaim lodges claims of fraud, Fed. R. Civ. P. 9(b) is pertinent. Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

As a preliminary matter, claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g., E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that an MCPA claim that "sounds in fraud[] is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Under the rule, a claim that sounds in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to

> eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

### C.    Choice of Law

In Counts One through Six, the Amended Counterclaim asserts several State law claims. ECF 25, ¶¶ 62-96. As indicated, subject matter jurisdiction is predicated on diversity, federal question, and supplemental jurisdiction. *Id.* ¶¶ 1-2.

Notably, a federal court sitting in diversity must apply the law of the forum state in which the court is located, including the forum state's choice-of-law rules, unless a compelling federal interest directs otherwise. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007). In regard to state law claims under diversity jurisdiction, federal courts apply the substantive law of the state in which the proceeding is brought. *See, e.g., Erie R.R. v. Tompkins*,

304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *see also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); 19 WRIGHT & MILLER, FED. PRACTICE & PROCEDURE § 4501 (3d ed.). And, federal courts apply the choice of law rules of the state in which the court sits. *See, e.g., Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010); *see also Prof'l Massage Training Cent., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 180 (4th Cir. 2015); *Demetres v. E. W. Const. Inc.*, 776 F.3d 271, 273 (4th Cir. 2015).

Both parties presume that Maryland law governs the State law claims. Because the choice-of-law principles are undisputed, I will apply Maryland law as to those claims.

### III. Limitations

The Amended Counterclaim contains a total of ten counts. Kiddie has moved to dismiss nine of them, asserting they are barred by the Franchise Agreement's one-year contractual limitations period, ECF 27-1 at 13-17, and by the applicable statutory period of limitations. *Id.* at 17-19. As to the claim of detrimental reliance under Count Six, Kiddie argues that it "is not a viable theory of relief under Maryland law." *Id.* at 13.

The bar of limitations is an affirmative defense. Ordinarily, limitations is not considered in the context of a motion to dismiss. *Edwards*, 178 F.3d at 243; *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 985 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004). However, "[w]hen it appears on the face of the complaint that the limitation period has run, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss." *Miller*, 224 F. Supp. 2d at 985; *see Pressley*, 553 F.3d at 336; *Goodman*, 494 F.3d at 464. In *Pilgrim's Pride Corp.*, 395 F.3d at 474, the Fourth Circuit said: "The raising of the statute of limitations as a bar to plaintiffs'

cause of action constitutes an affirmative defense and may be raised by motion pursuant to Fed. R. Civ. P. 12(b)(6), if the time bar is apparent on the face of the complaint."

### A. Contractual Limitations Period

Kiddie asserts that defendants' counterlclaims, excluding Count Six, are barred by the Franchise Agreement's one-year limitation period. ECF 27-1 at 13. Counterclaimants argue that the Franchise Agreement's limitation period is unconscionable and therefore unenforceable. ECF 30 at 3.

The Franchise Agreement, executed by defendants on March 6, 2014, ECF 27-2 states, in relevant part, at 57:

27.8 LIMITATION OF CLAIMS

ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR, OR FRANCHISEE'S OPERATION OF THE FRANCHISED BUSINESS, BROUGHT BY FRANCHISEE AGAINST FRANCHISOR, SHALL BE COMMENCED WITHIN ONE (1) YEAR FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED.

In the ordinary course, under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. *See* Maryland Code (2013 Repl. Vol., 2018 Supp.) § 5-101 of the Courts and Judicial Proceedings Article ("C.J."). Actions for breach of contract and tort actions are generally governed by Maryland's three-year statute of limitations. *See Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 169, 857 A.2d 1095, 1105 (2004); *Catholic Univ. of Am. v. Bragunier Masonry Contractors, Inc.*, 139 Md. App. 277, 297, 775 A.2d 458, 469 (2001), *aff'd*, 368 Md. 608, 796 A.2d 744 (2002). In addition, "[i]f the remedy sought in equity is analogous to a remedy cognizable at law, and the statute of limitations prescribes a time within which the legal action must be instituted, equity will

follow the law and bar the action." *Dual Inc.*, 383 Md. at 160 n.2, 857 A.2d at 1099 n.2 (citation omitted).

With respect to a civil RICO suit, it is governed by a four-year statute of limitations. The limitations period runs from the date when the plaintiff discovered, or should have discovered, the injury. *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001). And, defamation claims are subject to a one-year limitations period. C.J. § 5-105.

In the Franchise Agreement, the parties contractually agreed to a one-year limitations period. ECF 27-2 at 71. If effective, the Franchise Agreement would supersede the statutory limitations period of three years for the contract and tort claims and four years for the RICO claims. The counterclaimants contend that the clause is unreasonable and was fraudulently induced. ECF 25, ¶¶ 63-65; ECF 30 at 3-5.

"As a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991). As a threshold question, the court must determine whether the terms of the Franchise Agreement are enforceable with regard to limitations.

"[P]arties may agree to a provision that modifies the limitations result that would otherwise pertain provided (1) there is no controlling statute to the contrary, (2) it is reasonable, and (3) it is not subject to other defenses such as fraud, duress, or misrepresentation." *Ceccone v. Carroll Home Servs., LLC*, 454 Md. 680, 694, 165 A.3d 475, 483 (2017) (quoting *Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*, 132 Md. App. 158, 174, 752 A.2d 265, 273 (2000)). To determine whether a shortened limitations period is reasonable, a trial court must consider the "totality of the circumstances[.]" *Ceccone*, 454 Md. at 697, 165 A.3d at 485. According to the

Maryland Court of Appeals, courts should consider, for example, the following, *id.* at 697-98, 165 A.3d at 485 (footnotes omitted):

> [T]he length of the shortened limitations period (here, 1 year), its relation to the statutory period (one-third), the relative bargaining power of the parties, the subject matter of the contract (an agreement to service an oil-based home heating system), whether the shortened limitations period applies only to claims brought by one of the parties or runs in both directions, and other facets of the limitations provision— *e.g.*, it appears to apply equally to claims of negligence and intentional torts.

A "one-sided limitations period would be enforceable under Maryland law if supported by a 'valid justification.'" *Storto Enters., Inc. v. Exxonmobil Oil Corp.*, WDQ-10-1630, 2011 WL 231877, at *5 (D. Md. Jan. 24, 2011) (quoting *Walther v. Sovereign Bank*, 386 Md. 412, 435, 872 A.2d 735, 749 (2005)); *see also Client Network Servs. v. Smith*, PWG-15-2207, 2017 WL 3968471, at *2 (D. Md. Sept. 8, 2017). Conversely, "[w]ithout any justification, a one-sided term . . . may be substantively unconscionable and, if also procedurally unconscionable, void." *Client Network*, 2017 WL 3968471, at *3.

The parties primarily dispute the sophistication of the defendants. Kiddie Academy maintains that the parties entered an "arms-length business transaction between a franchisor and prospective franchisee who both had an opportunity to bargain and negotiate the affected terms, and is distinguishable from other contracts where one party has an obvious disadvantage in bargaining power." ECF 27-1 at 14 (internal quotation omitted) (citing ECF 25, ¶ 100 (referencing "telephone calls to discuss and negotiate the terms of Kiddie franchise sales")). In contrast, counterclaimants point generally to their allegations to support their position that they lacked bargaining power and sophistication. ECF 30 at 5.

Based on the allegations, which must be taken as true at this stage, Kiddie Academy possessed far superior bargaining power. The Amended Counterclaim alleges that the couple was inexperienced and unsophisticated in business. ECF 25, ¶ 16 ("Neither Supriya nor Sumanth are

22

sophisticated investors."); *see also id.* ¶¶ 28, 32, 49. Further, "Kiddie Academy was the first and only franchisor that Supriya or Sumanth had ever purchased." *Id.* ¶ 18. And, they claim that they "were not familiar with the laws or with the practices of franchisors." *Id.* In contrast, Kiddie is a business with multiple franchisees. *Id.* ¶ 6. Additionally, it employs a team of people to analyze and manage different aspects of its business. *Id.* ¶¶ 7-15. *See, e.g., Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, RDB-10-1932, 2012 WL 3025106, at *8 (D. Md. July 24, 2012) (concluding the franchisor's bargaining power was "far superior" to the franchisee's power, even though it was "clear that . . . the parties negotiated extensively").

In *Storto*, 2011 WL 231877, at *5, the court considered a franchise agreement that included a one-year contractual limitations period that applied only to the franchisee. Finding that "[n]o justification for the lack of mutuality [was] given in the Complaint or Franchise Agreement[,]" the court concluded that challenged claims were not time-barred under the contract. *Id.*

Like the franchise agreement in *Storto*, the Franchise Agreement here provides no justification for a one-sided limitations clause applying only to the franchisee. *See* ECF 27-2. Nor is a justification provided in Kiddie's Motion (ECF 27) or Reply (ECF 31).

To be sure, discovery may reveal important facts about this clause. For example, it may be that the counterclaimants consulted with an attorney about the limitations term in the Franchise Agreement. But, at this juncture, I cannot conclude that the one-year, one-sided limitation applies.

## B.    Statutory Limitations Period

Kiddie argues that the statute of limitations bars all but one of the counterclaimants' ten counts. ECF 27-1 at 17-19.

The original Counterclaim was filed on March 26, 2018. ECF 22. Kiddie filed a motion to dismiss on April 16, 2018. ECF 23. On April 27, 2018, Judge Garbis held a telephone

conference with counsel, in which defense counsel expressed "an intention to amend" the Counterclaim. *See* Docket; ECF 24 ("Initial Procedural Order"). On the same date, Judge Garbis dismissed the Counterclaim, without prejudice to the filing of an Amended Counterclaim. *See* ECF 24. And, he denied Kiddie's motion to dismiss, as moot. *Id.* On May 7, 2018, counterclaimants filed the Amended Counterclaim. ECF 25. To the extent relevant, the Amended Counterclaim relates back to the initial filing date. *See* Fed. R. Civ. P. 15(c)(1)(B).

### 1. Counts One to Four

As indicated earlier, under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. C.J. § 5-101. Most tort actions are governed by Maryland's three-year statute of limitations. *See Hartnett v. Schering Corp.*, 2 F.3d 90, 92 (4th Cir. 1993). However, as noted, a defamation claim is subject to a one-year statute of limitations. C.J. § 5-105.

An action typically accrues at the time of the wrong, unless a judicial or legislative exception provides otherwise. *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011). But, there are circumstances when this is not so. "[T]he question of accrual in C.J. § 5-101 is left to judicial determination, unless the determination rests on the resolution of disputed facts regarding discovery of the wrong." *Poole*, 423 Md. at 131, 31 A.3d at 236; *see Bank of New York v. Sheff*, 382 Md. 235, 244, 854 A.2d 1269, 1275 (2004) (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three years before suit was file); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000) (explaining that the determination of accrual "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied").

24

"Recognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," Maryland has adopted the so-called discovery rule to determine the date of accrual. *See Sheff*, 382 Md. at 244, 854 A.2d at 1275; *Frederick Road*, 360 Md. at 95, 756 A.2d at 973. "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F.Supp.2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 749 A.2d 796, 801 (2000)), *aff'd*, 495 Fed. Appx. 350 (4th Cir. 2012); *see Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 75, 904 A.2d 511, 521 (2006). Notably, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md. at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano*, 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *see Doe v. Archdiocese of Wash.*, 114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)).

A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and . . . a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1095 (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448-49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 636-38, 431 A.2d 677, 680-81 (1981). But, "[c]onstructive notice or knowledge will

not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

Application of the discovery rule involves a two-prong test. The Maryland Court of Appeals has explained that the first prong, "sufficiency of the actual knowledge to put the claimant on inquiry notice," concerns "the nature and extent of actual knowledge necessary to cause an ordinarily diligent plaintiff to make an inquiry or investigation that an injury has been sustained." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see O'Hara v. Kovens*, 305 Md. 280, 302, 503 A.2d 1313, 1324 (1986); *Pennwalt*, 314 Md. at 453, 550 A.2d at 1165–66 (noting that a plaintiff must have notice of the nature and cause of his or her injury). As indicated, with regard to inquiry notice, "a person must have actual notice, either express or implied. Express knowledge is direct, whether written or oral, from sources 'cognizant of the fact[s].'" *Benjamin*, 394 Md. at 89, 904 A.2d at 529 (quoting *Poffenberger*, 290 Md. at 636–37, 431 A.2d at 681) (citation omitted). Implied notice occurs "when a plaintiff gains knowledge sufficient to prompt a reasonable person to inquire further." *Pennwalt*, 314 Md. at 447, 550 A.2d at 1163. The second prong, "the sufficiency of the knowledge that would have resulted from a reasonable investigation," requires that after a reasonable investigation of facts, a reasonably diligent inquiry would have disclosed whether there is a causal connection between the injury and the wrongdoing. *Benjamin*, 94 Md. at 90, 904 A.2d at 529.

In Kiddie's view, counterclaimants were on notice of the allegedly "tortious conduct" prior to the execution of the Franchise Agreement on March 14, 2014, over three years before they filed their original Counterclaim on March 26, 2018. ECF 27-1 at 18. According to Kiddie, it does not matter if the counterclaimants failed to discover the alleged conduct until July 2016 or April 2017, because "no allegations are made as to what [they] believe Kiddie Academy actually did to keep

them ignorant of the alleged fraud or how [they] were diligent in their efforts to uncover the truth." ECF 27-1 at 18.

Counterclaimants contend that they "did not know of the potential claim, including the injury[,] until less than three years prior to the filing of the Amended Counterclaim." ECF 30 at 5. The Amended Counterclaim alleges "that it was not until April, 2015, when they first were able to find out . . . that 'it was quite common for site selections to take two or three years or longer[.]'" *Id.* (quoting ECF 25, ¶ 22). Before that date, they claim that "they had no reason to doubt that their experience was unique." ECF 30 at 5.

Limitations is an affirmative defense. Therefore, as to the counterclaim, Kiddie has the burden of proof. *Newell*, 323 Md. at 725, 594 A.2d at 1156. And, as discussed earlier, and of import here, a trial court ordinarily does not grant a motion to dismiss "based on the assertion that the cause of action is barred by the statute of limitations unless it is clear from the facts and allegations on the face of the complaint that the statute of limitations has run." *Litz v. Md. Dep't of Env't*, 434 Md. 623, 641, 76 A.3d 1076, 1086 (2013); *accord Goodman*, 494 F.3d at 465; *Rounds v. Md.-Nat'l Capital Park & Planning Comm'n*, 441 Md. 621, 655, 109 A.3d 639, 659 (2015).

At this juncture, I cannot determine from the face of the Amended Counterclaim whether or when defendants were on inquiry notice as to their various claims. Resolution of this issue, before discovery, would be premature.

### 2. Defamation Claim (Count Five)

Under Maryland law, "[a]n action for assault, libel, or slander shall be filed within one year from the date it accrues." C.J. § 5-105. "Although, ordinarily, the limitations period runs from the time that the defamatory statement is published, Maryland law follows the discovery rule[.]" *Gainsburg v. Steben & Co.*, 838 F. Supp. 2d 339, 342 (D. Md. 2011), *aff'd*, 519 F. App'x 199 (4th

Cir. 2013); *see also Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 464 (D. Md. 2008).

Kiddie asserts that counterclaimants were on notice of the alleged defamation no later than August 2015, over a year before the counterclaimants filed the initial Counterclaim. ECF 27-1 at 19. Counterclaimants allege, however, that they did not learn of the alleged defamation until April 2017. *Id.* Based on the allegations, the truth of which I must assume at this juncture, *see E.I. du Pont de Nemours & Co.*, 637 F.3d at 440, the count of defamation is not time-barred, because defendants lacked notice until April 2017.

### 3. RICO Claims (Counts Seven to Ten)

"Private RICO suits are governed by a four-year statute of limitations, which runs from the date when the plaintiff discovered, or should have discovered, the injury." *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001).

As Kiddie states, "The RICO claims in Counts Seven through Ten are based on the same underlying conduct as [the counterclaimants'] fraud allegations claiming that Kiddie Academy induced them to enter into the Principal Franchise Agreement." ECF 27-1 at 18 (citing ECF 25, ¶¶ 98, 100, 112, 113, 118, 120). In the context of a Rule 12(b)(6) motion, I cannot conclude that the RICO counts are time-barred.

### IV. Failure to State a Claim

Even if counterclaimants' claims are not time-barred, Kiddie argues that the Amended Counterclaim fails to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6), as well as the heightened pleading requirements of Fed. R. Civ. P. 9(b).

## A.    Fraud Claims

### 1.    Counts One and Two

Count One, "(Intentional Misrepresentation) Fraud or Deceit", alleges that Kiddie made several false representations to defendants, with the purpose of "induc[ing] them to sign a Franchise Agreement" and "defrauding" them. ECF 25, ¶¶ 63, 65. Further, counterclaimants assert that their reliance on Kiddie's misrepresentations was reasonable because they "had been told on repeated occasions that Kiddie and its employees were able to handle all aspects of setting up a franchise." *Id.* ¶ 66. In addition, "Kiddie bragged about its leadership in the industry and their qualifications for setting up successful franchises." *Id.* As a "direct result" of such misrepresentations, counterclaimants allege that they suffered damages, including the $120,000 they paid in "startup and franchise fees" to Kiddie. *Id.* ¶¶ 66-67.

Count Two alleges "Fraud in the Inducement." *Id.* ¶¶ 68-70. Counterclaimants assert that Kiddie made the above misrepresentations "for the purpose of inducing [them] to sign the franchise agreement with Kiddie." *Id.* ¶ 69.

Kiddie seeks to dismiss Counts One and Two on the basis that counterclaimants do not allege such misrepresentations with sufficient particularity. ECF 27-1 at 19-23.

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew,* 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Such claims implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g., First Kuwaiti Gen'l Trading & Contracting Co.,* 612 F.3d at 731. And, at trial the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for intentional or fraudulent misrepresentation, which is the garden variety of fraud and is often described simply as "fraud," the plaintiff ordinarily must show:

> 1) that the defendant made a false representation to the plaintiff;
> 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
> 3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
> 4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
> 5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Gourdine v. Crews*, 405 Md. 722, 758, 955 A.2d 769, 791 (2008); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

Additionally, "a cause of action for fraud" has "a strict requirement of scienter." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 147, 838 A.2d 404, 433 (2003). "Recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Id.*; *see VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998); *Sass*, 152 Md. App. at 430, 82 A.2d at 260.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). And, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

"The tort of fraudulent inducement 'means that one has been led by another's guile,

surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)). "In fraudulent inducement cases, a defrauded party may elect between two remedies, which are exclusive." Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* § 3.92, at 346 (5th ed. 2013). "Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." *Sonnenberg v. Sec. Mgmt. Corp.*, 325 Md. 117, 127, 599 A.2d 820, 823 (1992).

Notably, fraud cannot be predicated on statements that are merely "'expressions as to what will happen in the future.'" *Sass*, 152 Md. App. at 438, 832 A.2d at 265 (quoting *Levin v. Singer*, 227 Md. 47, 63, 175 A.2d 423, 432 (1961)); *see Highlands Office Park Three, LLC v. GE Commercial Fin. Bus. Prop. Corp.*, WDQ-08-2972, 2009 WL 10682225, at *4, n.7 (D. Md. Feb. 25, 2009); *Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 73, 810 A.2d 1045, 1064 (2002). The Fourth Circuit has said: "It is true, as a general rule, that an action for fraud will lie only for misrepresentation of past or existing facts, and that breach of a promise to render a performance in the future is redressable only by an action in contract." *Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541, 546 (4th Cir. 1987).

Defendants concede that "fraud generally cannot be predicated on promissory statements because the failure to fulfill a promise is a breach of contract, not fraud." ECF 30 at 13. But, as defendants also recognize, "a promissory representation . . . 'made with an existing intention not to perform is actionable for fraud.'" *Id.* (citation omitted); *see Learning Works, Inc.*, 830 F.2d at 546; *see also Gooden v. Wells Fargo Home Mortg.*, AW–08–2521, 2010 WL 1068119, *4 (D. Md.

Mar. 17, 2010); *Orteck Int'l Inc. v. TransPacific Tire & Wheel, Inc.*, DKC-05-2882, 2006 WL 2572474, *11 (D. Md. Sept. 5, 2006); *Sass*, 152 Md. App. at 436, 832 A.2d at 264; *Parker v. Columbia Bank*, 91 Md. App. 346, 360-61, 604 A.2d 521, 528 (1992) (same). Therefore, "[s]imply because a statement concerns an event that may occur in the future does not preclude liability based on fraud." *Aloi v. Moroso Inv. Partners, LLC*, DKC-11-2591, 2012 WL 4341741, at *4 (D. Md. Sept. 20, 2012) (citing *Bagel Enter., Inc. v. Baskin & Sears*, 56 Md. App. 184, 203, 467 A.2d 533, 542-43 (1983) ("Maryland recognizes an action for fraud based on fraudulent representations of future intentions.")).

As indicated, Maryland courts have recognized that "a promise made to induce another to execute a contract, which the promisor never intended to perform, may create liability for fraud." *Sass*, 152 Md. App. at 432, 832 A.2d at 262 (citing *Councill v. Sun Ins. Office*, 146 Md. 137, 150, 126 A. 229, 234 (1924)). It follows that "an action for fraud may not be dismissed on this basis if the alleged fraud is based on a defendant's promise that is made with the present intention not to perform that promise." *Aloi*, 2012 WL 4341741, at *4 (citing *Sass*, 152 Md. App. at 436, 832 A.2d at 264). On the other hand, the "failure to fulfill a promise is merely a breach of contract." *Kerr v. Johns Hopkins Univ.*, L-10-3294, 2011 WL 4072437, at *7 (D. Md. Sept. 12, 2011) (quoting *Sass*, 152 Md. App. at 438, 832 A.2d at 265), *aff'd*, 473 F. App'x 246 (4th Cir. 2012), *cert. denied*, 568 U.S. 1124 (2013).

Thus, Maryland cases distinguish "between statements that are 'a prediction or an expression of expectation concerning external events' and those that are 'relate[d] to matters within the speaker's control.'" *Carroll Co. v. Sherwin-Williams Co.*, 848 F. Supp. 2d 557, 569 (D. Md. 2012) (quoting *Gross*, 332 Md. at 272, 630 A.2d at 1169 (alteration in *Carroll*)). Therefore, a predictive statement by a speaker who holds himself out as "knowledgeable in a particular field"

can support a claim of fraud "where the circumstances indicate . . . that the speaker has a factual basis for his predictions so that the existence of facts is implied by the representations." *Cooper*, 148 Md. App. at 73-74, 810 A.2d at 1064 (citation omitted); *see also Hale Trucks of Md., LLC v. Volvo Trucks North Am., Inc.* 224 F. Supp. 2d 1010, 1031-32 (D. Md. 2002).

Counterclaimants allege protracted business negotiations, over a period of years, involving alleged representations, many of which were mere predictions or puffery; others were verifiable by defendants; and still others were of a kind on which defendants could not reasonably rely. Many of the alleged assertions are of a nature that one would have expected to be included in the parties' written communications or contract. Critically, defendants fail to provide any facts to support the assertion that Kiddie deliberately made statements with the intent to deceive or for the purpose of defrauding the counterclaimants.

For example, counterclaimants contend that on May 9, 2011, during the couple's visit to Kiddie Academy in Maryland, Commarota allegedly told the defendants that "'his team' would guide them through the entire construction process." ECF 25, ¶ 24. As Kiddie Academy's VP of Construction, Commarota held himself out as knowledgeable in construction and certainly knowledgeable in Kiddie's construction process. The Amended Counterclaim alleges that Commarota's statements were false because he knew that Kiddie "did not typically guide franchisees through the entire construction process" and, allegedly, Kiddie never intended to guide defendants. *Id.* ¶ 24.

In addition, counterclaimants assert that Helwig and Wise falsely assured "Kiddie's support," and assured defendants that "their lack of industry experience would not be an issue due to Kiddie's proven curriculum, marketing, and support from all Kiddie's departments." *Id.* ¶ 28; *see also id.* ¶ 32. However, Kiddie did "not buil[d] a platform which would guide them to success."

*Id.* ¶ 28. At a training on April 20, 2015, Kiddie also promised counterclaimants that its employees "would be present for the interviews of candidates for the franchise's 'Director,'" but "Kiddie never provided the promised assistance with the Director selection." *Id.* ¶ 56.

Defendants also complain that Kiddie withheld information on the performance of other franchisees and misled them on the length of time it would take for their franchise to become profitable. *Id.* ¶ 30. Further, they claim Kiddie understated their payroll taxes and property taxes,. Yet, such information would seem equally available to defendants. *Id.* They also complain about "mistakes" in construction, *id.* ¶ 47, but such allegations plainly do not sound in fraud.

Further, defendants complain that between February and May of 2011, Kiddie assured them that the site selection process "takes anywhere from 3 to 9 months . . . ." *Id.* ¶ 21. Yet, they contend that Frick knew that it "often took far longer . . . ." *Id.* Defendants also assert that Kiddie did not approve a site for them in Texas until November 2013. *Id.* ¶ 37. Obviously, that far exceeded 3 to 9 months. Yet, defendants paid a franchise fee of $50,000 in March 2014 (*id.* ¶ 40), well after they would have known that the alleged representation as to the length of the site selection process (3 to 9 months) was incorrect.

Indeed, the fraud claims are replete with allegations that do not smack of fraud: Kiddie underestimated by $32,000 the cost of a playground "splash pad," *id.* ¶ 50; Kiddie did not tell defendants that the construction plans would have to be "re-permitted without the 'splash pad,'" *id.* ¶ 51; defendants chose to reject Kiddie's architect choice, reflecting that defendants were not as dependent on Kiddie as they would like to suggest. *Id.* ¶ 52.

What the Maryland Court of Special Appeals said in *Goldstein v. Miles*, 159 Md. App. 403, 436, 859 A.2d 313, 332 (2004), is apt: "A statement that is 'vague and indefinite in its nature and terms, or is merely a loose conjectural or exaggerated statement, is not sufficient to support' either

34

a fraud or negligent misrepresentation action, because 'such indefinite representations ought to put the person to whom they are made, upon the inquiry, and if he chooses to put faith in such statements, and abstained from inquiry, he has no reason to complain.'" (citation omitted); *see also Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344, 349 (1962).

In this business transaction, defendants allege "a business deal gone bad . . . ." *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (RICO case). However, "puffing and related expressions of opinion that are common in sales [are] not actionable as fraud." *Id.* at 1000. Defendants focus on repeated false assurances and predictions. But, mere predictions are not actionable for fraud, unless defendants plead with sufficient particularity that such statements were knowingly false or "made with reckless indifference" to their truth and "made for the purpose of defrauding" them. This they have not done. As to intent to deceive, it clearly would not have been in Kiddie's interest to delay the opening of a franchise.

An unsuccessful business venture, without more, does not state a claim for fraud. Therefore, I shall grant the Motion as to Counts One and Two.

### 2. Fraudulent Concealment (Count Three)

Count Three, "(Intentional Misrepresentation) (Concealment or Non-Disclosure)," alleges that Kiddie failed "to disclose [] material facts to induce them to sign the franchise agreement with Kiddie." ECF 25, ¶ 72. In particular, Kiddie allegedly failed to disclose information concerning "expected enrollment, realistic operating costs, statistics and projections of what was needed to become a successful profitable Kiddie Academy franchise[.]" *Id.* ¶ 76. In addition, Kiddie "expressly" told defendants, *inter alia*, "that construction costs would not exceed $180 per square foot, when it knew that the costs would be around $200 per square foot, thereby increasing [counterclaimants'] construction costs by approximately $260,000." *Id.* ¶ 78. In reliance on the

information provided by Kiddie, counterclaimants decided to purchase their Kiddie Academy franchise." *Id.* ¶ 79.

Kiddie urges dismissal of the claim for deceit or fraudulent concealment, contending that the allegations "do not evince the type of special relationship required in order to impose a duty on Kiddie Academy to disclose material facts to [counterclaimants]." ECF 27-1 at 22.

Counterclaimants do not address this argument in their Opposition. *See* ECF 30 at 11-13. Rather, they argue generally that their "Fraud claims are adequately pleaded." *Id.* at 11.

In Maryland, the essential elements of a claim for fraudulent concealment are as follows:

(1) the defendant owed a duty to the plaintiff to disclose a material fact;
(2) the defendant failed to disclose that fact;
(3) the defendant intended to defraud or deceive the plaintiff;
(4) the plaintiff took action in justifiable reliance on the concealment; and
(5) the plaintiff suffered damages as a result of the defendant's concealment.

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010); *Lloyd v. General Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007); *Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999).

In *Lubore v. RPM Associates, Incorporated*, 109 Md. App. 312, 330, 674 A.2d 547, 556 (1996), the Maryland Court of Special Appeals said: "One who conceals facts that materially qualify affirmative representations may be liable for fraud." But, non-disclosure ordinarily "does not constitute fraud unless there exists a duty of disclosure." *Frederick Road, supra*, 360 Md. at 100 n. 14, 756 A.2d at 976 n. 14 (2000). Maryland courts have determined that a duty to disclose "arises in certain relationships such as a confidential or fiduciary relationship." *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 566, 843 A.2d 902, 908 (2004); *see also Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323-24, 389 A.2d 887 (1978) (finding

a duty to disclose based on a fiduciary relationship); *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867 (1984) (finding a duty to disclose based on a confidential relationship).

"To be sure, a confidential relationship may exist in a business relationship. Certain factors above and beyond a typical business relationship must exist, however." *Brass Metal Prods., Inc., v. E-J Enters., Inc.*, 189 Md. App. 310, 357, 984 A.2d 361, 388 (2009) (citation omitted). The court added, *id.* at 357-58, 984 A.2d at 389: "'For example, a confidential relationship may exist when there is a relationship independent of the business relationship. . . . Additionally, a confidential relationship may exist in a business relationship if 'confidences are reposed by one person in another, who as a result gains an influence and superiority over him.'"

Here, the Franchise Agreement expressly provided that no fiduciary relationship existed between Kiddie and the counterclaimants. Section 21.1, titled "Independent Contractor Status," provides, in relevant part, ECF 27-2 at 53:

> The parties acknowledge and agree that this Agreement does not create a fiduciary relationship and that Franchisee is an independent contractor, and that nothing in this Agreement is intended to constitute either party as an agent, fiduciary, legal representative, subsidiary, joint venture, partner, employee or servant of the other for any purpose whatsoever. . . . During the Term and any renewal of this Agreement, Franchisee will hold itself out to the public as an independent contractor operating the Franchised Business pursuant to a franchise granted by Franchisor. . . .

In any event, this claim fails for the same reasons that the other fraud counts fail. Therefore, Count Three is subject to dismissal.

### B.  Negligent Misrepresentation (Count Four)

Count Four alleges a claim of negligent misrepresentation.   ECF 25, ¶¶ 82-88. Counterclaimants assert that Kiddie "had a duty of care . . . to provide accurate information necessary" for defendants "to make a decision as to whether to purchase the Kiddie Academy franchise." *Id.* ¶ 84. However, defendants contend, *inter alia*, that Kiddie "breached that duty by

providing incomplete and misleading information" to defendants, "including, but not limited to, material false information concerning ramp up times, payroll expenses, property taxes and ability of [counterclaimants] to become financially profitable with their franchise." *Id.* ¶ 85. Further, they allege that Kiddie knew that they "would rely upon . . . false, misleading, and incomplete statements and information . . . ." *Id.* ¶ 87. And, as a result of Kiddie's conduct, defendants "incurred damages," including construction costs and startup and franchise fees. *Id.* ¶ 88.

Kiddie contends that the Amended Counterclaim fails to state a claim for negligent misrepresentation because "the claimed misrepresentations are based on alleged projections or withholding of information, not affirmative statements." ECF 27-1 at 20.

Although deceit and negligent misrepresentation "share common elements," such as the making of a false statement and reliance by the plaintiff, "[t]here is a crucial difference between the two torts." *Id.* at 259-60, 630 A.2d at 1162. Fraud requires intentional conduct on the part of the defendant, whereas negligent misrepresentation "only requires conduct which falls below the standard of care the maker of the statement owes to the person to whom it is made." *Id.* (citations omitted).

In *Lloyd*, 397 Md. at 136, 916 A.2d at 273 (quotation marks omitted), the Maryland Court of Appeals sets forth the elements of a claim for negligent misrepresentation under Maryland law:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Numerous Maryland cases are to the same effect. *See, e.g., Griesi v. Atlantic Gen'l Hosp. Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Blondell*, 413 Md. at 119, 991 A.2d at 94; *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md.

34, 43, 656 A.2d 307, 311 (1995); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336-37, 439 A.2d 534, 539 (1982); *Virginia Dare Stores v. Schuman*, 175 Md. 287, 291-92, 1 A.2d 897, 899 (1938); *see also Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290-91 (D. Md. 2003); *All Med. Personnel, Inc. v. Ameritox, LLC*, 18-CCB-1527, 2018 WL 5810866, at *2 (D. Md. Nov. 6, 2018).

Notably, the duty of care in a negligent representation case differs from the duty to disclose in a fraudulent concealment case. *See, e.g., Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 629 n.8 (D. Md. 2003). Maryland law recognizes that the scope of duty varies with the underlying tort. *Id.*

A "negligent misrepresentation claim based on statements promissory or predictive in nature" is not viable "[u]nless the plaintiff puts forward evidence tending to show that the 'promisor' or 'predictor' made the statements with the present intention not to perform...." *Miller v. Fairchild Indus., Inc.*, 97 Md. App. 324, 346, 629 A.2d 1293, 1304 (1993). But, a promise made with the present intention not to perform is "perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation." *Id.*

Put another way, "[i]n order for a negligent misrepresentation claim based upon a promise of future conduct to be actionable, the party making the representation regarding its future conduct must know, at the time it makes the representation, that it does not intend to carry out the promise." *Heritage Oldsmobile,* 264 F. Supp. 2d at 291. But, if "the party knows the representation to be false at the time it is made, then the claim is one for *fraudulent* misrepresentation" and the "negligent misrepresentation claim [is converted] into a claim for fraudulent misrepresentation." *Id.* (emphasis in original); *see also Orteck,* 2006 WL 2572474 at *20 ("To the extent that a party making the representation about its future conduct knows at the time the statement is made that it

is false, the [negligent misrepresentation] claim converts to one of *fraudulent* misrepresentation") (emphasis in original); *D.& G Flooring, supra*, 346 F. Supp. 2d at 822 (stating, with respect to plaintiff's claim that defendant made promises without present intent to perform: "These are representations regarding [defendant's] future conduct, i.e., promises; promises are not actionable under a theory of negligent misrepresentation.").

However, counterclaimants' allegations are not entirely limited to promises about future performance or conduct. *See* ECF 27-1 at 23-24. For example, they allege that at the training on April 20, 2015, Conley advised them that "the numbers provided to the bank at Kiddie's direction barely met the minimum lending guidelines for approval, and that it was imperative that Defendants receive the support from Kiddie to reach the given projections." ECF 25, ¶ 54. But, when defendants asked Murphy "to see Kiddie's historical numbers," Murphy refused to "share this historical information due to 'proprietary reasons.'" *Id.* ¶ 55. Conley allegedly explained to the couple that "due to construction cost overruns and an increase in SBA closing costs that the lender had reduced the requested working capital budget." *Id.* Defendants contend, *id.*: "The cost overruns, the increase in SBA closing costs and the increased time to ramp up to break even were due to Kiddie's intentional or negligent provision of information to Defendants to present to the lender."

At the motion to dismiss stage, generously taking the facts in the light most favorable to counterclaimants, I am satisfied that counterclaimants' allegations are sufficient to state a plausible claim of negligent misrepresentation.

Therefore, the Court will deny the Motion as to Count Four.

## C. Defamation Per Se (Count Five)

In Count Five, counterclaimants assert a claim of defamation per se. ECF 25, ¶¶ 89-92. They allege that "Kiddie by and through its agents and/or employees asserted false material facts," including "defamatory remarks about [Ms. Sumanth], her honesty and integrity and her ability to follow direction and instructions from Kiddie." *Id.* ¶ 90. The Amended Counterclaim further alleges, *id.* ¶ 91: "These statements were made in Kiddie company meetings by, *inter alia*, Commarota, Malizia and Huggins, and by Commarota and Malizia outside of those meetings to third persons, including, but not limited to, Lisa Conley, Kori Wilson, and Wendy Magus." *Id.* ¶ 91. Counterclaimants maintain that the statements exposed Ms. Sumanth "to public scorn, hatred, contempt or ridicule[.]" *Id.* ¶ 92.

Kiddie contends counterclaimants' defamation claim fails "because the alleged statements were privileged or otherwise not actionable." ECF 27-1 at 24.

Under Maryland law, "'[a] defamatory statement is one which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.'" *Norman v. Borison*, 418 Md. 630, 645, 17 A.3d 697, 705 n.10 (2011) (quoting *Offen v. Brenner*, 402 Md. 191, 198-99, 935 A.2d 719, 723-24 (2007)). The tort of defamation consists of four elements: "'(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm.'" *Id.*; *see also Sullivan v. City of Frederick*, JKB-17-1881, 2018 WL 337759, at *8 (D. Md. Jan. 9, 2018) (quoting *Offen*). A statement is false if it was "'not substantially correct.'" *Piscatelli v. Van Smith*, 424 Md. 294, 306, 35 A.3d 1140, 1147 (2012) (quoting *Batson v. Shiflett*, 325 Md. 684, 726, 602

A.2d 1191, 1213 (1992)). The plaintiff bears the burden of establishing falsity. *Batson*, 325 Md. at 726, 602 A.2d at 1213.

"Maryland has retained the common law distinction between defamation *per quod* and defamation *per se*." *Sullivan*, 2018 WL 337759, at \*8 (citing *Ind. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441, 966 A.2d 432, 448 (2009)). "Defamation *per se* is defamation on its face—i.e. the 'words themselves impute the defamatory character.'" *Sullivan*, 2018 WL 337759, at \*8 (quoting *Metromedia, Inc. v. Hillman*, 285 Md. 161, 172, 400 A.2d 1117, 1123 (1979)). "In the case of defamation per quod, extrinsic facts must be alleged in the complaint to establish the defamatory character of the words or conduct." *Ind. Newspapers*, 407 Md. 441-42, 966 A.2d at 448 (citing *M&S Furniture Sales Co., Inc. v. Edward J. De Bartolo Corp.*, 249 Md. 540, 544, 241 A.2d 126, 128 (1968)).

The Maryland Court of Appeals has recognized a qualified privilege "to publish to someone who shares a common interest, or, relatedly, to publish in defense of oneself or in the interest of others." *Gohari v. Darvish*, 363 Md. 42, 57, 767 A.2d 321, 329 (2001)). Qualified privilege, also referred to as the "common interest" privilege, provides that a "'person ought to be shielded against civil liability for defamation where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient or third parties . . . .'" *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 758 (D. Md. 2015) (quoting *Gohari*, 363 Md. at 56, 767 A.2d at 328); *see also Lindenmuth v. McCreer*, 233 Md. App. 343, 358-59, 165 A.3d 544, 553 (2017).

The *Darvish* Court explained, 363 Md. at 58, 767 A.2d at 328:

Common interests are usually found among members of identifiable groups in which members share similar goals or values or cooperate in a single endeavor . . . . . The idea is to promote free exchange of relevant information among those engaged

in a common enterprise or activity and to permit them to make appropriate internal communications and share consultations without fear of suit[.]

Moreover, "communications may enjoy a qualified privilege, whether from a legal or moral duty to convey the information, or from a mutual interest of the communicator and recipient in the subject matter." *De Leon v. Saint Joseph Hosp., Inc.*, 871 F.2d 1229, 1237 (4th Cir. 1989) (discussing Maryland law). Generally, when a statement enjoys a qualified privilege, the privilege defeats an action for defamation. *Jacron Sales Co., Inc. v. Sindorf*, 276 Md. 580, 598-99, 350 A.2d 688, 698-99 (1976), *overruled on other grounds by Le Marc's Mgmt. Corp. v. Valentin*, 349 Md. 645, 651 709 A.2d 1222, 1225 (1998); *see Shapiro v. Massengill*, 105 Md. App. 743, 778, 661 A.2d 202, 220 (1995). "The existence of a conditional privilege is a question of law for the judge, and the burden of proof is upon the defendant," or here, the counterdefendant. *Woodruff v. Trepel*, 125 Md. App. 381, 402, 725 A.2d 612, 622 (1999); *see also Lindenmuth*, 233 Md. App. at 359, 165 A.3d at 553.

However, a qualified privilege can be overcome or defeated if the employer acted with "actual malice" toward the former employee. *Marchesi v. Franchino*, 283 Md. 131, 139, 387 A.2d 1129, 1131 (1978). "[A] plaintiff seeking to rebut the privilege must do so by demonstrating that the defendant made the alleged statement with malice[.]" *Seley-Radtke v. Hosmane*, 450 Md. 468, 474, 149 A.3d 573, 577 (2016). The Maryland Court of Appeals has articulated a "'stringent standard of malice' to defeat a qualified privilege, requiring a plaintiff to show that the defendant acted with a 'reckless disregard as to truth or falsity' of the statement." *Lindenmuth*, 233 Md. App. at 360, 165 A.3d at 554 (quoting *Marchesi*, 283 Md. at 134-35, 387 A.2d at 1131); *see also Attorney Grievance Comm'n of Md. v. Frost*, 437 Md. 245, 276, 85 A.3d 264, 282 (2014); *Batson*, 325 Md. at, 728, 602 A.2d at 1213.

In *Bagwell v. Peninsula Regional Medical Center*, 106 Md. App. 470, 665 A.2d 297

(1995), the Maryland Court of Special Appeals explained that actual malice is established when the plaintiff shows publication either with reckless disregard for its truth or actual knowledge of falsity. And, it reiterated:

> Actual malice cannot be established merely by showing that: the publication was erroneous, derogatory or untrue; the [defendant] acted out of ill will, hatred or a desire to injure . . . ; the [defendant] acted negligently; the [defendant] acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory subject; or the [defendant] acted without undertaking the investigation that would have been made by a reasonably prudent person. Moreover, malice is not established if there is evidence to show that the [defendant] acted on a reasonable belief that the defamatory material was "substantially correct" and "there was no evidence to impeach the [defendant's] good faith.

*Id.* at 512-13, 665 A.2d at 381 (internal quotations and citations omitted). *See New York Times v. Sullivan*, 376 U.S. 254, 286 (1964).

Furthermore, to defeat a qualified privilege, a plaintiff may demonstrate "that the defendant did not make the statement 'in furtherance of the interest for which the privilege exists.'" *Lindenmuth*, 233 Md. App. at 362-363, 165 A.3d at 556 (quoting *Happy 40, Inc. v. Miller*, 63 Md. App. 24, 33, 491 A.2d, 1210, 1214 (1985)).

Counterclaimants assert that Kiddie employees made several defamatory statements about Ms. Sumanth during construction meetings with staff. ECF 25, ¶ 48. In particular, the Amended Counterclaim alleges that during Kiddie meetings Malizia "repeatedly referred to" Ms. Sumanth "as a liar and dishonest in her business practices" and "repeatedly laughed at [the couple] whenever their franchise came up during these meetings[.]" *Id.*

The alleged statements shared among Kiddie employees during business meetings were privileged, as Kiddie's staff possessed a "common" interest in the company's professional dealings with Ms. Sumanth. *Gohari*, 363 Md. at 58, 767 A.2d at 328 (defining the conditional privilege based on a common interest). Further, the Amended Counterclaim fails to allege facts sufficient

to demonstrate that Malizia or other employees did not make the statements in furtherance of the protected privilege. *See* ECF 25, ¶¶ 89-92.

Counterclaimants further allege: "Commarota stated that [Ms. Sumanth] was going to regret her decisions to use another architect, and that she was not knowledgeable enough to manage her project." *Id.* These statements were purportedly made outside of internal meetings to former Kiddie employees, including Conley, Magus, and Kori Wilson. *Id.*[7]

The Amended Counterclaim mentions that the individuals to whom Commarota spoke were no longer employed by Kiddie[.]" ECF 25, ¶ 48. However, the alleged statements – Ms. Sumanth was going to regret her decisions to use another architect and she was not knowledgeable enough to manage her project – are not statements that would expose Ms. Sumanth to public scorn, contempt, or ridicule. *See Norman*, 418 Md. at 645, 17 A.3d at 705 n.10 (citation omitted). Furthermore, the statements are non-actionable, subjective statements. *See Gallardo v. FedEx Kinko's Office & Paint Servs., Inc.*, JFM-08-392, 2008 WL 2143011, at *7 (D. Md. May 12, 2008) ("'[W]hen a speaker plainly expresses a subjective view, an interpretation, a theory, conjecture or surmise, rather than [a] claim[] to be in possession of objectively verifiable [false] facts, the statement is not actionable.'") (quoting *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998)) (alterations in *Biospherics*).

As such, Count V is subject to dismissal.

### D.    Detrimental Reliance (Count Six)

Count Six alleges detrimental reliance or promissory estoppel.    ECF 25, ¶¶ 93-96. Counterclaimants allege that defendants reasonably relied on Kiddie's representations "in

---

[7] Counterclaimants also refer to statements made by Huggins, without providing any information as to the alleged defamatory statement. ECF 25, ¶ 91.

expending monies in connection with the grant of the franchise for the Kiddie Academy franchise in Texas, opening and operating the franchise and in foregoing other business opportunities." *Id.* ¶ 94.

In its Motion, Kiddie contends that Maryland law does not recognize detrimental reliance as "a basis for an affirmative cause of action." ECF 27-1 at 25. Rather, detrimental reliance, "[m]ore commonly known as the doctrine of promissory estoppel," "is a shield used as a defense to a cause of action, or to avoid a defense[.]" *Id.*

In support, Kiddie relies on *Cogan v. Harford Memorial Hospital*, 843 F. Supp. 1013, 1021 (D. Md. 1994). There, the plaintiff asserted the doctrine of *equitable estoppel* as an affirmative cause of action. *Id.* The court dismissed the claim, reasoning: "In Maryland, this doctrine can be used as a defense to a claim or to avoid a defense, but not as the basis for an affirmative cause of action." *Id.* (citing *Sav-A-Stop Servs., Inc. v. Leonard*, 44 Md. App. 594, 410 A.2d 603, 607 (1980), *aff'd*, 289 Md. 204, 424 A.2d 336 (1981)).

However, counterclaimants maintain that *Cogan* is inapplicable here. ECF 20 at 14. The court's ruling was limited to equitable estoppel, a "distant cousin" of promissory estoppel. *Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 674 A.2d 521, 523 n.1 (1996). In describing the "different elements" of the "two theories," the Fourth explained in *Edell & Associates, P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 440-41 (4th Cir. 2001):

> Promissory estoppel offers a vehicle to enforce a promise for which there is no consideration, but the plaintiff nonetheless relied upon the promise to his detriment in circumstances that make it unconscionable not to enforce the promise. *Allen M. Campbell Co. v. Virginia Metal Indus., Inc.*, 708 F.2d 930, 931 (4th Cir. 1983). A clear and definite promise on the part of the defendant is an essential element of a promissory estoppel claim. *Pavel Enters., Inc.*, 674 A.2d at 532. Such is not the case with respect to the invocation of the doctrine of equitable estoppel, which relates to misrepresentations of fact, positive acts, and omissions. *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 322 A.2d 866, 878 (1974); *J.F. Johnson Lumber*

*Co. v. Magruder*, 218 Md. 440, 147 A.2d 208, 212 (1958); *Ganley* [*v. G&W Ltd. P'ship*, 44 Md. App. 568, 409 A.2d 761, 764 (1980)].

In its Reply, Kiddie argues that counterclaimants have failed to state a claim, regardless of whether they attempted to plead promissory estoppel or equitable estoppel. ECF 31 at 11.

"[I]n Maryland, promissory estoppel is an alternative means of obtaining contractual relief." *Md. Transp. Auth. Police Lodge #34 of the Fraternal Order of Police, Inc. v. Md. Transp. Auth.*, 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010), *rev'd on other grounds*, 420 Md. 141, 21 A.3d 1098 (2011); *see also Pavel Enters., Inc.*, 342 Md. at 169, 674 A.2d at 534 ("[T]here are different ways to prove that a contractual relationship exists . . . . Traditional bilateral contract theory is one. Detrimental reliance [a.k.a. promissory estoppel] can be another."); *Suburban Hosp., Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992) (applying Maryland law, and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract").

The elements of a promissory estoppel or detrimental reliance claim in Maryland were established in the touchstone case of *Pavel Enterprises, Incorporated*, 342 Md. at 166, 674 A.2d at 533:

1. a clear and definite promise;
2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3. which does induce actual and reasonable action or forbearance by the promisee; and
4. causes a detriment which can only be avoided by the enforcement of the promise.[]

*Accord Citiroof Corp. v. Tech Contracting Co., Inc.*, 159 Md. App. 578, 589, 860 A.2d 425, 432 (2004); *Konover Prop. Trust, Inc., supra*, 142 Md. App. at 484, 790 A.2d at 724.

To be sure, throughout the Amended Counterclaim, counterclaimants maintain that Kiddie promised "to provide all the professional guidance that was necessary to be successful in the child care business." ECF 25, ¶ 73; *see also id.* ¶¶ 27, 38, 56, 58. According to defendants, they reasonably relied on this representation "in expending monies," and in "opening and operating the franchise and in foregoing other business opportunities." *Id.* ¶ 94. And, they contend that Kiddie "reasonably expected" that its "representations and promises would induce action" on the part of defendants. *Id.* ¶ 96.

Under Maryland law, a promissory estoppel claim for money damages is a claim at law. *Ver Brycke v. Ver Brycke*, 379 Md. 669, 698, 843 A.2d 758, 775 (2004) (stating that plaintiffs' unjust enrichment and promissory estoppel claims "were claims at law because they were claims seeking the remedy of restitution for money"). In *Ver Brycke*, 379 Md. at 693, n.9, 843 A.2d at 772 n.9, the Maryland Court of Appeals characterized promissory estoppel as a "quasi-contract" claim, and noted: "'The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'" *Id.* (quoting *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600, 607 (2000)).

Here, the parties had a written contract, *i.e.*, the Franchise Agreement. Therefore, the detrimental reliance allegations have no basis in contract. To the extent defendants allege reliance, it is relevant to their tort claim for negligent misrepresentation. But, it is not a freestanding tort claim. Therefore, I shall grant the Motion as to Count Six.

### E.   Counts Seven to Ten

#### 1.   RICO Generally

The counterclaimants assert several RICO claims. I begin with an overview of a civil RICO claim.

Congress enacted RICO as Title IX of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, 84 Stat. 922 (1970). *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). RICO prohibits various activities generally associated with organized crime. *See* 18 U.S.C. §§ 1963, 1964.

Under 18 U.S.C. § 1962, it is unlawful, *inter alia*, for any person employed by or associated with any enterprise to conduct or participate in the "enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). But, RICO is not limited to criminal cases. In addition to criminal penalties, Congress "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Grp.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

A civil RICO action "'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" *U.S. Airline Pilots Ass'n v. Awappa, LLC,* 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see, e.g., Lewis v. Maryland,* PWG-17-1636, 2018 WL 1425977, at *5 (D. Md. Mar. 22, 2018); *Bailey v. Atlantic Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014). But, the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).

A plaintiff may establish a civil RICO claim by proof of "'1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity.'" *Morley*

*v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)); *see Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (citing 18 U.S.C. §§ 1962, 1964); *see also Bhari Info. Tech. Sys. Private Ltd. v. Sriram*, 984 F. Supp. 2d 498, 503 (D. Md. 2013); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 472 (D. Md. 2012).

A prevailing plaintiff in a civil RICO action is entitled to treble damages, costs, and attorney's fees. *Friedler v. Cole*, CCB-04-1983, 2005 WL 465089, at *7 (D. Md. Feb. 28, 2005). The Supreme Court has characterized RICO's civil penalties as "'drastic.'" *Awappa*, 615 F.3d at 317 (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989)); *see* 18 U.S.C. § 1964(c)).

Congress has directed that the statute "be liberally construed to effectuate its remedial purposes." Pub. L. 91–452, § 904(a), 84 Stat. 941, 947. But, "Congress contemplated that only a party engaging in widespread fraud would be subject to" the "serious consequences" available under the RICO statute, such as treble damages. *Menasco, Inc.*, 886 F.2d at 683. And, courts have recognized the "need to limit [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." *Friedler*, 2005 WL 465089, at *7.

The Fourth Circuit has noted the "distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *El-Shamari*, 217 F.3d at 238. It has admonished that courts must

> exercise caution "to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."

*Awappa*, 615 F.3d at 317 (quoting *Menasco, Inc.*, 886 F.2d at 683) (ellipsis in *Awappa*).

In other words, RICO "is not a cause of action to be pled lightly," and "'RICO treatment is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" *Biggs v. Eaglewood Mortg., LLC*, 582 F. Supp. 2d 707, 714 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009). It applies to "'ongoing unlawful activities whose scope and persistence pose a special threat to social well-being.'" *Menasco, Inc.*, 886 F.2d at 684 (quoting *Zepkin*, 812 F.2d at 155).

In order to analyze the adequacy of a RICO claim, it is important to understand RICO's terms and concepts.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). *See, e.g., Boyle v. United States*, 556 U.S. 938, 944 (2009); *Kimberlin v. Nat'l Bloggers Club*, GJH-13-3059, 2015 WL 1242763, at *3 (D. Md. Mar. 17, 2015). In *Mitchell Tracey*, 935 F. Supp. 2d at 842, the court explained:

> An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985). To satisfy § 1962(c)'s "distinctiveness" requirement, the Plaintiffs must further allege that the RICO "enterprise" is distinct from the defendant "person" alleged to have violated RICO. *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 457 (E.D. Pa. 2010); *Toucheque v. Price Bros. Co.*, 5 F. Supp. 2d 341, 346-47 (D. Md. 1998).

Because "'an enterprise includes any union or group of individuals associated in fact,'" RICO extends to "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. at 944 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). Moreover, a RICO enterprise "need not have a hierarchical structure or a chain of command; decisions may be made on an ad hoc basis and by any number of methods." *Id.* at 948.

However, "'[v]ague allegations of a RICO enterprise . . . lacking any distinct existence and structure' will not survive dismissal." *Mitchell Tracy*, 935 F. Supp. 2d at 843 (citation omitted; modifications in *Mitchell Tracy*).

"Racketeering activity" is defined in § 1961(1)(B) to include a laundry list of "indictable" acts, such as mail fraud, wire fraud, financial institution fraud, among many other crimes. "To allege a pattern of racketeering activity, a plaintiff must present facts making it plausible, rather than possible, that: (1) at least two predicate acts occurred within ten years of each other; (2) the predicate acts were related; and (3) the acts 'amount to or pose a threat of continued criminal activity.'" *Swarey v. Desert Capital REIT, Inc.*, DKC-11-3615, 2012 WL 4208057, at *12 (D. Md. Sept. 20, 2012) (quoting *H.J. Inc.*, 482 U.S. at 239).

Notably, "RICO is not 'aimed at the isolated offender.'" *Zepkin*, 812 F.2d at 155 (quoting *Sedima*, 473 U.S. at 496 n.14). Therefore, "[t]he pattern requirement was intended to limit RICO to those cases in which racketeering acts are committed in a manner characterizing the defendant as a person who regularly commits such crimes." *Lipin Enters. v. Lee*, 803 F.2d 322, 324 (7th Cir. 1986).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). To prove a pattern, a plaintiff is required to show that the predicate acts "are [1] related *and* [2] that they amount to or pose a threat of *continued* criminal activity." *H.J. Inc.*, 492 U.S. at 239 (first emphasis in original; second emphasis added).

Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240 (citation omitted). And, the enterprise's actions

must affect interstate commerce. *Sterling v. Ourisman Chevrolet of Bowie, Inc.* 943 F. Supp. 2d 577, 587-88 (D. Md. 2013).

As indicated, a pattern of racketeering activity involves *continued* criminal activity. *H.J. Inc.*, 492 U.S. at 239. The Fourth Circuit has adopted a "flexible" approach to the "continuity" requirement. *Brandenburg v. Seidel*, 859 F.2d 1179, 1185 (4th Cir. 1989), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). Courts utilize a "case-by-case analysis, *Capital Lighting and Supply, LLC v. Wirtz*, JKB-17-3765, 2018 WL 3970469, at *6 (D. Md. Aug. 20, 2018), and consider "the 'criminal dimension and degree' of the alleged misconduct." *HMK Corp. v. Walsey*, 828 F.2d 1071, 1073 (4th Cir. 1987) (citation omitted); *see Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987) ("[N]o mechanical test can determine the existence of a RICO pattern."); *Brandenburg*, 859 F.2d at 1185 (noting that continuity depends on "all the facts and circumstances of the particular case—with special attention to the context in which the predicate acts occur").

"'Continuity' is both a closed – and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. The Fourth Circuit explained in *Mensaco, Inc. v. Wasserman*, 886 F.2d 681, 683-84 (4th Cir. 1989):

> Continuity . . . refers to a closed period of *repeated* conduct, or to past conduct that by its nature projects into the future with a threat of *repetition*. To satisfy the continuity element, a plaintiff must show that the predicates themselves amount to, or . . . otherwise constitute a threat of, *continuing* racketeering activity. Significantly, [p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Thus, predicate acts must be part of a prolonged criminal endeavor.

(Internal quotation marks, citations, and parentheticals omitted; alteration and emphasis in original).

As to continuity, "[f]acts relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." *Brandenburg*, 859 F.2d at 1185.

Where a fraud claim is asserted as the predicate act for a civil RICO violation, Rule 9(b)'s particularity requirement applies. *See, e.g., Lewis*, 2018 WL 1425977, at *5 (applying heightened pleading standard to claims under RICO); *Healy v. BWW Law Grp., LLC*, PWG-15-3688, 2017 WL 281997, at *6 (D. Md. Jan. 23, 2017) (same); *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mr. 29, 2016) (applying Fed. R. Civ. P. 9(b) to RICO claim based on mail or wire fraud), *aff'd*, 671 F. App'x 127 (4th Cir. 2016); *Bailey*, 992 F. Supp. 2d at 584 ("A plaintiff must plead circumstances of the fraudulent acts that form the alleged pattern of racketeering activity with sufficient specificity pursuant to Fed. R. Civ. P. 9(b).") (citations and quotation marks omitted); *Sriram*, 984 F. Supp. 2d at 505.

### 2.    Analysis

I turn to the sufficiency of counterclaimants' RICO allegations.

Counts Seven and Eight of the Amended Counterclaim allege predicate acts of RICO, specifically mail and wire fraud. ECF 25, ¶¶ 97-106. Count Nine asserts a RICO claim premised on 18 U.S.C. § 1962(c). *Id.* ¶¶ 107-14. In Count Ten, counterclaimants allege that Kiddie and its employees conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). *Id.* ¶¶ 115-20.

As an initial matter, Kiddie contends that the RICO conspiracy claim in Count Ten is barred by the "intracorporate immunity doctrine." ECF 27-1 at 38 (citing *Bailey v. Atl. Auto Corp.*, 992 F. Supp. 2d 560, 567-72 (D. Md. 2014)). In *Baltimore-Washington Telephone Co. v. The Hot*

*Leads Co., L.L.C.*, 584 F. Supp. 2d 736 (D. Md. 2018), the late Judge Roger W. Titus explained the doctrine as follows:

> [T]he "intracorporate conspiracy doctrine" holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. In essence, this means that a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves. *See, e.g., Marmott v. Maryland Lumber Company*, 807 F.2d 1180, 1184 (4th Cir. 1986); *Buschi v. Kirven*, 775 F.2d 1240, 1251 (4th Cir. 1985); *Denney v. City of Albany*, 247 F.3d 1172 (11th Cir. 2001).

Relying on the intracorporate immunity doctrine, Kiddie argues that "a conspiracy in this case is not legally possible, as the employees of a corporation cannot legally conspire among themselves or with their corporate principal." ECF 27-1 at 38 (citing *Am Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 223-24 (4th Cir. 2004)). In their Opposition, counterclaimants concede that "Kiddie is correct" and therefore "abandon the RICO conspiracy claims" contained in Count Ten. ECF 30 at 25.

As such, Count Ten is subject to dismissal. The remaining RICO counts (Counts Seven, Eight, and Nine) are predicated on 18 U.S.C. § 1962(c). Kiddie contends that all counts fail to state a claim under RICO. ECF 27-1 at 29-39.

In support of their RICO claims, counterclaimants offer three alternative theories of "enterprise" within the meaning of 18 U.S.C. §§ 1961(4), 1962(c): (1) Kiddie Academy; (2) "the executive management and employees of Kiddie; or (3) Helwig, Steelman, Frick, Gould, Wise, and Murphy. The Amended Counterclaim alleges that, beginning in 2012 and "continuing to the present," Kiddie and its employees engaged in a series of acts of mail and wire fraud with the purpose, *inter alia*, of "defrauding Kiddie franchisees of money or property and/or selling . . . franchises." *Id.* ¶¶ 108(c), 109(b). Kiddie "employed the same or similar methods of commission"

against the Sumanths, "Patrick Paul of Northvale, New Jersey," and other unidentified franchisees. *Id.* ¶ 112.

As part of Kiddie's scheme to defraud counterclaimants, Murphy appointed a Franchise Business Consultant "to provide ongoing operational support to assure [the Sumanths'] success as franchisees" but the consultant "had no franchise experience, no experience in operating or managing a business, and no experience, training or knowledge with daycare centers or pre-school education and had never managed people in a supervisory role" and was unfamiliar with the "Texas market." *Id.* ¶ 27. In addition, Helwig and Wise "falsely assured" the company's support and "constantly assured" the couple "that their lack of industry experience would not be an issue due to Kiddie's proven curriculum, marketing, and support from all Kiddie's departments." *Id.* ¶ 28.

Kiddie, Commarota, Fink, Wise, Helwig, and Magus "refused to give specific information, or historical information" to the Sumanths "to induce them into signing an agreement to become a franchise." *Id.* ¶ 29. Kiddie and its employees also used "the U.S. Postal service and interstate wires . . . to receive and/or deliver, *inter alia*, FDDs,[8] franchise agreements, acknowledgment forms relating to franchise agreements, correspondence relating to the marketing and sale of Kiddie franchises, telephone calls to discuss and negotiate the terms of Kiddie franchise sales, funds for the payment of franchise fees, loan documents to and from financial institutions that financed franchisee build-out and operational costs, and funds for the payment of royalty fees." *Id.* ¶ 101.

On June 12, 2011, defendants signed the Preliminary Agreement (ECF 27-2) and paid the first installment of $20,000 towards the total franchise fee of $120,000. ECF 25, ¶¶ 31, 32. Upon

---

[8] Counterclaimants reference "FDDs" throughout their Amended Counterclaim and Opposition, but fail to define the term. *See* ECF 25, ¶¶ 100, 101; ECF 30 at 18-24.

the execution of the Agreement, the Kiddie Enterprise presented the franchisees with "false financial information, projections, and estimates knowing and intending that financial institutions (including the U.S. Small Business Administration) would rely on such false financial information when approving or guaranteeing loans, credit, and other financial obligations of Kiddie franchisees[.]" *Id.* ¶ 106 (citing *id.* ¶¶ 22, 33, 34, 40, 44, 53-58).

After finding a site in Austin, Texas, defendants "paid the second installment of franchise fees of" $50,000 on March 14, 2014. *Id.* ¶ 40. During the construction of the site, counterclaimants allege that the Kiddie Enterprise "deliberately or negligently" budgeted construction costs. *Id.* ¶ 50.

In April 2017, counterclaimants "learned from other franchisees," including Patrick Paul, "that Kiddie had not provided them promised support, had knowingly instructed them to apply for a government insured loan through the Small Business Administration, and given them false and misleading franchise projections and information through the wires and mail that could not be supported through Kiddie's known historical data." *Id.* ¶ 58.

That same month, Conley allegedly told the Sumanths "that Kiddie had never revealed true numbers to its franchisees and she had won an unemployment lawsuit against them and one of the reasons for her resigning was she was forced to change enrollment numbers for all franchisees on their proforma." *Id.* ¶ 61.

As a result of Kiddie's fraudulent activities, "franchisees incurred travel expenses and lost work time to investigate and negotiate their purchase of the Kiddie Academy franchises, paid franchise fees, incurred debt to finance the build-out and operation of their franchised businesses, secured the incurred debt with liens on homes and other property, purchased equipment and

services for purposes of operating their franchises, hired and paid employees to staff their franchises, and paid royalties." ECF 25, ¶ 105; *see also id.* ¶ 114.

Counterclaimants also allege that "Kiddie intimidated and threatened other franchisees who discussed the fraudulent behavior by Kiddie in dealing with them." *Id.* ¶ 80. Further, they allege, *id.*: "This pattern of intimidation continues to this day. Other franchisees are afraid to discuss the false and incomplete material information they also got from Kiddie." However, such speculative allegations do not supply any details as to the identity or activity of the other purported victims. *See Menasco*, 886 F.2d at 684 (concluding that the allegations lacked the specificity needed to show a distinct threat of continuing racketeering activity because the complaint did not provide the identity or activity of additional victims); *Swarey*, 2012 WL 4208057, at *13 (same).

In its Motion, Kiddie contends that counterclaimants' RICO allegations fail to satisfy the continuity and distinctiveness requirements necessary to state a claim under § 1962(c). ECF 27-1 at 31-36. As to continuity, Kiddie argues that "there is no continuing pattern of racketeering activity to give rise to a RICO claim" and that counterclaimants "cannot establish the required pattern and continuity by their vague references to other 'Kiddie Franchisees' for whom no specific facts are provided." *Id.* at 36. With respect to distinctiveness, Kiddie asserts, *id.* at 34: "A corporation carrying out its regular business affairs with its own employees or agents cannot comprise a distinct 'enterprise' for purposes of RICO." *Id.* at 34 (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[B]y alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant, the distinctness requirement may not be circumvented.")

I agree with Kiddie that the allegations do not adequately satisfy the continuity requirement. As the Fourth Circuit has repeatedly noted, "RICO treatment is reserved for conduct 'whose scope and persistence pose a special threat to social well-being.'" *GE Investment*, 247 F.3d 543, 551 (quoting *Menasco*, 886 F.2d at 684)). Plaintiffs' allegations do not suggest such a threat, as "this case is not sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238.

Indeed, the predicate acts targeted a narrow set of victims: the Sumanths and Patrick Paul. *Id.* at 238 (finding that predicate acts of mail and wire fraud involving one victim did not transform "ordinary fraud" into a RICO violation although the acts were "related" and "involved three discrete schemes spanning several years"); *see also Menasco*, 886, F.2d at 684-85 (holding that scheme to defraud only two victims did not constitute a RICO violation but implying that a claim alleging 27 victims of same scheme would suffice). Although the Fourth Circuit has made clear that "[t]here is no per se rule against a RICO claim involving" a small set of victims, the "narrow focus of the scheme" in this case also does not satisfy the continuity requirement needed to establish a pattern of racketeering activity. *Al-Abood*, 217 F.3d at 238.

For these reasons, the Amended Counterclaim fails to assert allegations sufficient to satisfy the continuity requirement. Therefore, it is unnecessary to discuss the parties' arguments as to the distinctiveness requirement. As such, I shall grant the Motion as to Counts Seven, Eight, and Nine.

## V. Conclusion

For the reasons stated above, I shall deny the Motion (ECF 27) with respect to Count IV, for negligent misrepresentation. Otherwise, I shall grant the Motion.

An Order follows, consistent with this Memorandum Opinion.

Date:  March 31, 2019

/s/
Ellen Lipton Hollander
United States District Judge