IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KIDDIE ACADEMY DOMESTIC
FRANCHISING, LLC,
    *Plaintiff*,

v.

WONDER WORLD LEARNING,
LLC, *et al.*,
    *Defendants*.

Civil Action No. ELH-17-3420

## MEMORANDUM OPINION

In this franchisor-franchisee dispute, plaintiff Kiddie Academy Domestic Franchising, LLC ("Kiddie" or "Kiddie Academy"), a franchisor of early childhood learning centers, has sued its former franchisee, Wonder World Learning, LLC ("Wonder World" or "WWL"), and the franchisee's principals, Sumanth Nandagopal and Supriya Sumanth, who are husband and wife. ECF 1 (the "Complaint").[1] Kiddie alleges that defendants, who opened a Kiddie franchise in Cedar Park, Texas in 2015, defaulted on their financial obligations, in breach of the parties' franchise agreement. Kiddie also alleges that defendants have refused to return proprietary materials, in violation of federal trademark and copyright law.

In response, defendants have filed counterclaims against Kiddie and various Kiddie officers. ECF 22; ECF 25; ECF 40. In a Memorandum Opinion (ECF 63) and Order (ECF 64) of November 15, 2019, I permitted defendants to pursue a counterclaim for negligent

---

[1] The case was originally assigned to Judge Marvin Garbis. It was reassigned to me on November 14, 2018, due to his retirement. *See* Docket.

As in previous memorandum opinions (ECF 33; ECF 63), because Mr. Nadagopal and Ms. Sumanth share the name "Sumanth," when I refer to them collectively, I shall do so as the "Sumanths." *See* ECF 27-1 at 5 n.1. And, I sometimes refer to defendants collectively as Wonder World.

misrepresentation under Maryland law against Kiddie and two Kiddie officers, Joshua Frick and Lene Steelman.  The operative counterclaim, the Second Amended Counterclaim ("SAC"), is docketed at ECF 40-2.

The labyrinthine history of this litigation is discussed, *infra*.  Six motions are presently pending.  First, Kiddie has moved for summary judgment under Fed. R. Civ. P. 56 as to defendants' claim for negligent misrepresentation.  ECF 49.  The motion is supported by a memorandum of law (ECF 49-1) (collectively the "Kiddie S.J. Motion") and 28 exhibits.  ECF 49-2 to ECF 49-29.  Kiddie has also moved, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings as to defendants' affirmative defenses (ECF 50), supported by a memorandum of law.  ECF 50-1 (collectively, the "Rule 12(c)" or "J.P." Motion").  Defendants oppose both motions and have submitted seventeen exhibits.  ECF 57 (Opposition to Rule 12(d) Motion); ECF 58 (Opposition to S.J. Motion); ECF 58-1 to ECF 58-17.  And Kiddie submitted a reply for each motion.  ECF 61 (Reply to Rule 12(d) Motion); ECF 62 (Reply to S.J. Motion).

In addition, Mr. Frick and Ms. Steelman have moved to dismiss defendants' counterclaim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 72 (Frick); ECF 73 (Steelman).  Each motion is supported by a memorandum (ECF 72-1, Frick) (ECF 73-1, Steelman) and the same seventeen exhibits.  *See, e.g.*, ECF 72-2 to ECF 72-18. Defendants responded to both motions. ECF 72 (Opposition to Frick Motion); ECF 73 (Opposition to Steelman Motion).  Ms. Steelman and Mr. Frick have replied.  ECF 79 (Frick Reply); ECF 80 (Steelman Reply).

After briefing had concluded, defendants sought to supplement the record, submitting a memorandum (ECF 88) and thirty-nine exhibits.  ECF 88-1 to ECF 88-39 (collectively, the "Supplement").  When Kiddie objected to the filing as an improper surreply (ECF 89),  defendants

filed a "Motion For Leave Of Court To File Supplemental Submission And Motion For Reconsideration Of The Dismissal of Counts One, Two And Three Of Second Amended Counterclaim" (ECF 90, the "Motion to Supplement") and a "Motion For Reconsideration Of The Dismissal Of Counts One, Two and Three Of the Second Amended Counterclaim." ECF 91 (the "Motion to Reconsider"). Kiddie opposes both motions. ECF 92; ECF 94. Defendants have not replied and time to do so has expired. *See* Local Rule 105.2.

No hearing is necessary to resolve the various motions. *See* Local Rule 105(6). For the reasons that follow, I shall grant the J.P. Motion (ECF 50) in part and deny it in part. I shall deny the Motion to Reconsider (ECF 91), and I shall grant the Motion to Supplement (ECF 90) in part and deny it in part. And, pursuant to Rule 56, I shall grant the Kiddie S.J. Motion (ECF 49), the Frick Motion (ECF 72), and the Steelman Motion (ECF 73).

## I.   Background

### A.  Factual Background

Kiddie Academy, a limited liability company organized under Delaware law and headquartered in Abingdon, Maryland, is the franchisor of "Kiddie Academy Educational Child Care," a nationwide network of infant, preschool, and early education facilities. ECF 49-23 (Declaration of Gregory H. Helwig), ¶ 5. It has nearly 200 franchised centers in twenty-six states and the District of Columbia, and over 100 centers in various stages of development. *Id.*

Defendant Wonder World, a limited liability company formed under Texas law, is the former franchised operator of a Kiddie Academy childcare center located at 1602 Medical Parkway, Cedar Park, Texas. *See* ECF 1-1 (Franchise Agreement) at 5, 60. The Sumanths are the principals and sole members of Wonder World. ECF 1, ¶ 3. Ms. Sumanth has a Masters in

Business Administration from Bangalore University and is "familiar with generally accepted accounting principles." ECF 58-2 (Affidavit of Surpiya Sumanth), ¶ 2.

According to defendants, the Sumanths "began researching child care franchise companies" in January 2011. ECF 40-2, ¶ 14. Ms. Sumanth avers that she and her husband were attracted to Kiddie Academy because "Kiddie's marketing department told [them] . . . that owner operators of its franchises did not need any training or experience as Kiddie provided all training and information needed to run a Kiddie Academy childcare center." ECF 58-2, ¶ 6. Further, Ms. Sumanth attests that Kiddie boasted that "its school curriculum was as good or better than its best competitor," notwithstanding the lack of "empirical evidence to support that statement." *Id.* ¶ 7. The Sumanths applied to become Kiddie franchisees in February 2011. ECF 40-2, ¶ 15.

With Kiddie's assistance, defendants initially searched for a suitable location to start a franchise in San Jose, California, where the Sumanths then resided. ECF 40-2, ¶¶ 20, 39. However, when no suitable location was found, the Sumanths "were told by Kiddie that the Texas market was booming" and warranted their consideration. ECF 58-2, ¶ 10. According to Ms. Sumanth, they "decided to look in the Austin, Texas market" based "on Kiddie's recommendation over other cities in North Carolina and Oregon." *Id.*

In contrast, Kiddie maintains that the Sumanths are the ones who selected Austin, relying on emails between Ms. Sumanth and Lene Steelman, Kiddie's Vice President of Accounting. On August 13, 2013, Ms. Sumanth emailed Ms. Steelman, informing her that a proposed deal to establish a franchise in Milpitas, California "fell through," and the couple was "working on relocating to Austin, TX from [the] SF Bay Area." *See* ECF 49-3. Ms. Sumanth explained, *id.*: "We feel this place will be better [sic] us both personally and professionally." Ms. Sumanth

4

advised that she would be visiting Austin, Texas the following week to "tour a few sites there along with Josh Frick," Kiddie's Vice President of Real Estate. *Id.*

In order to start a franchise, defendants needed to obtain financing. As prospective franchisees, Kiddie Academy provided assistance with this process, including helping defendants apply for commercial loans. These applications included, among other documents, pro forma financial statements—Microsoft Excel formatted spreadsheets containing projected revenues and expenses associated with the construction and operation of the childcare center. *See, e.g.*, ECF 49-5 (blank Kiddie pro forma). The preparation of defendants' pro forma was an iterative process spanning September 2013 to February 2014. *See* ECF 58-2, ¶ 20.

On September 20, 2013, Ms. Sumanth sent an email to Ms. Steelman, stating that she was "actively looking for sites in the Austin market" and wanted "to run a base pro-forma" premised on a Kiddie facility housed in a rented 8,500 square-foot facility with a rental rate of $24/SFR and $5/SF for "Operation Expense Rent." ECF 49-4. Ms. Steelman sent Ms. Sumanth a blank pro forma template on September 23, 2013. ECF 49-5. Later that day, Ms. Sumanth sent Ms. Steelman a completed pro forma and advised that she had "updated the proforma [sic] with the enrollment figures for Years 1-3" and "lowered the tuition rates as [she] felt the ones previously entered could be on the high end of the market." ECF 49-6.

Ms. Steelman responded to Ms. Sumanth's email on October 3, 2013, and sent her a revised draft of the pro forma. ECF 49-7. The next day, Ms. Sumanth replied that the "proforma [sic] does not look good" and requested that she and Ms. Steelman arrange a conference call to discuss the changes. ECF 49-8.

In October and November 2013, Kiddie generated Site Analysis Reports ("SARs") assessing the viability of three potential locations for the Sumanths' franchise in Austin, Texas.

*See* ECF 62-1 (11/21/2013 SAR for 1602 Medical Parkway); 62-2 (10/16/2013 SAR for 101 Brushy Creed Rd. and 15550 Ranch Road).   Each SAR contained a variety of data, including demographic information, such as total potential customers, population growth rates, and a median household income; traffic counts; and a list of competitors in the vicinity.   However, Ms. Sumanth maintains that the SARs were "not accurate and did not provide all the information necessary to making [sic] an informed decision as to whether [they] should construct and operate [a] Kiddie Academy franchise."   ECF 58-2, ¶ 13.   Without further elaboration, Ms. Sumanth avers that the SARs "failed to accurately consider competition and the necessary demographic data including income levels of the residents of the area."   *Id.*

On or about December 5, 2013, the Sumanths, accompanied by Mr. Frick, visited three potential sites for their franchise in Austin.   *See* ECF 72-7 (12/6/2013 email) at 2.   The next day, the Sumanths stated that they had "decided" to select 1602 Medical Parkway, Cedar Park, Texas as the location for their future Kiddie franchise.   *Id.*

Thereafter, the Sumanths continued to revise their pro forma.   Ms. Sumanth sent Ms. Steelman a draft pro forma on January 10, 2014.   ECF 49-9.   And, on January 31, 2014, Ms. Sumanth sent Ms. Steelman an "updated Business Plan and Proforma [sic]" for the center in Cedar Park.   ECF 49-10.   Ms. Sumanth stated that they had asked Ms. Steelman to "review both documents and provide [her with] feedback" and advised that she "ha[d] made changes to the tuition rates, the building cost and enrollments."   *Id.*   Further, on February 6, 2014, Ms. Sumanth emailed a revised draft of the pro forma to Ms. Steelman with altered enrollment and tuition rates. ECF 49-11.

To obtain capital for their site in Cedar Park, defendants solicited financing proposals from several institutions, including Evolve Bank, Capital Bank Texas, and Square 1 Bank.   *See* ECF 49-

12 (2/18/2014 email from Ms. Sumanth to John Little at Square 1 Bank); ECF 72-11 (2/18/2014 email from Ms. Sumanth to Rob Lewis at Capital Bank Texas); ECF 72-16 at 2 (4/23/2014 email from Robert Ruiz at Evolve Bank to Ms. Sumanth).   Specifically, the Sumanths sought a loan in the amount of $2,700,000 to finance the land purchase, building construction, and start-up costs of the center.   *See* ECF 49-12; ECF 72-11.   To that end, defendants submitted the same pro forma to these banks in February 2014.   *Compare* ECF 72-14 (Square 1 Bank pro forma) at 6-24; ECF 72-15 (Capital Bank pro forma) at 6-24.

On March 14, 2014, prior to loan approval, Kiddie Academy and Wonder World executed a Franchise Agreement, by which Wonder World agreed to operate a Kiddie childcare center in Cedar Park, Texas at the Medical Parkway location.   ECF 49-15 (Franchise Agreement).   In addition, the Sumanths executed a Personal Guaranty as to Wonder World's obligations under the Franchise Agreement.   *Id.* at 63-64.

Robert Ruiz, a Senior Business Development Officer at Evolve Bank, emailed Ms. Sumanth on March 23, 2014, expressing concerns with the profitability of defendants' proposed site for their Kidde Academy franchise.   ECF 72-16 at 2; *see* ECF 58-2, ¶ 14.   Mr. Ruiz advised defendants that he had "reviewed the competition near the subject site and actually called several of the competitors."   ECF 72-16 at 2.   From those conversations, Mr. Ruiz had learned that only two competitors had waitlists and the majority had availability for the next academic year, which "indicates that the market is oversaturated here."   *Id.*   He expressed that Evolve Bank "like[s] a lot about the transaction but not the location based on the competition."   *Id.*   As an attachment to his email, Mr. Ruiz sent Ms. Sumanth several maps highlighting the established childcare centers near defendants' proposed site as well as a financial analysis performed by Evolve Bank, which cast doubt on the site's profitability.   *See id.* at 3-34.

The next day, March 24, 2014, Ms. Sumanth forwarded Mr. Ruiz's email to Mr. Frick and

Ms. Steelman.  *See id.* at 34-35.  She wrote, *id.* at 34:

> Please see the email below from my lender and underwriter. There is some
> convincing to do on the location for our center. I am putting together my research,
> and will forward that to Robert and cc all of you. While I have checked the demand
> in every age group, it seems like the underwriter is focused only on the Toddler age
> group (and he did explain why too).
>
> Josh, appreciate it if you can put together a supporting document for approving the
> location.

Mr. Frick replied that he would reach out to Mr. Ruiz, and copy Ms. Sumanth on the email.

*Id.* at 34.  Also on March 24, 2014, Ms. Sumanth wrote to Mr. Ruiz, pushing back on Evolve

Bank's assessment.  *Id.* at 37.  She noted that "the underwriter is focused only on the toddler age

group, while [her] research on the market demand was broad-based across all age groups," and she

questioned the underwriter's selection of comparator childcare centers.  *Id.*  As promised, Mr.

Frick also wrote to Mr. Ruiz, defending the viability of the Sumaths' proposed site.  *Id.* at 40.  Ms.

Sumanth wrote to Mr. Frick, *id.*: "Very nice email. Thank you, Josh! Hope it convinces the bank

of our site location and market."

It appears that Evolve Bank was unmoved by these efforts and declined to provide a loan

to defendants.  In the afternoon of March 24, 2014, Mr. Frick wrote to Ms. Sumanth in regard to

Evolve Bank's decision, *id.* at 39: "I don't think they did very good research themselves which

caused us to have to justify our decision logic. Had they done the proper research they would have

come to the same conclusion as us.  It is kind of ironic."  Ms. Sumanth replied, *id.*: "I completely

agree."

On April 15, 2014, Square 1 Bank provided defendants with a commitment letter for a

$2,677,000 loan.  ECF 49-14 at 4.  Several months later, in September 2014, defendants, with

guidance from Kiddie Academy, returned to Square 1 Bank seeking to increase the amount of their

loan in light of construction overruns and a revised estimate of the cost of teachers and staff.  ECF 49-16 (9/30/2014 revised pro forma); ECF 49-17 (10/6/2014 email from Lisa Conley to Ms. Sumanth).  On October 14, November 5, and November 10, 2014, defendants sent a second, third, and fourth pro forma, respectively, to Square 1 Bank.  ECF 49-19 (10/14/2019 pro forma); ECF 49-20 (11/5/2014 pro forma); ECF 49-21 (11/10/2014 pro forma).

Relevant here, the first page of each pro forma contains a "**DISCLAIMER**" that reads, *see, e.g*., ECF 49-20 at 4:

> This pro-forma operating report estimates operating cash flows of a Kiddie Academy® Child Care Learning Center franchise. Kiddie Academy Domestic Franchising, LLC neither warrants nor guarantees that the amounts included on the report are correct; all such amounts are estimates only. Enrollments, revenues, costs, and operating results WILL vary from these estimates in most cases.

Defendants closed on their loan with Square 1 Bank on November 21, 2014.  ECF 49-22 (11/21/2014 email from John Little from Square 1 Bank to Ms. Sumanth).

Lisa Conley, a Finance Manager at Kiddie from November 2013 to September 2016, attests that she assisted the Sumanths in preparing these pro formas.  ECF 58-17 (Affidavit of Lisa Conley), ¶ 8.  According to Ms. Conley, these pro formas were "not realistic in accordance with historical numbers," "overestimated tuition revenue," and "underestimated expenses significantly."  *Id.* ¶ 9.  Ms. Conley observes that the pro formas "calculated the state minimum number of teachers" but "Kiddie knew that more teachers were needed to operate the Kiddie Academy childcare centers than that was required by the State of Texas."  *Id.* ¶ 10.  Further, Ms. Conley avers that the pro formas did not include credit card processing expenses, but Kiddie "encourages" its franchisees to take credit and debit card payments.  *Id.* ¶ 13.

Regarding the construction of defendants' franchise, Ms. Sumanth attests that "Kiddie's agents, and employees made significant errors during the construction," including "budgeting

incorrectly for a 'splash pad' on the playground area." ECF 58-2, ¶ 30.  Further, she contends that Kiddie Academy failed to inform defendants that certain "licensing requirements were missing from the construction and design" of defendants' center, including "the handwashing sink in the infant room, the glass window cut-outs in the infant nap area, children's toilets in the toddlers and playground areas, and a diaper changing station in the two year old classroom . . . ." *Id.* ¶ 32. Similarly, Ms. Conley avers Kiddie provided the Sumanths "with wrong information" during the construction process, including recommending toilets that were not suitable for toddlers, underestimating the cost of a splashpad, and approving walls that "were built incorrectly." ECF 58-17, ¶¶ 18-20.

Wonder World began operating its Kiddie Academy franchise on August 17, 2015. ECF 49-23, ¶ 8.  According to Gregory H. Helwig, Kiddie's President, franchisees are required, pursuant to their franchise agreement, to close out their financial records at the end of each week and export the data to Kiddie Academy. *Id.* ¶ 18.  The data is then used to calculate the franchisee's "Gross Revenues" for the week, as defined in the franchise agreement, which in turn determines the amount of royalties that the franchisee owes. *Id.*  Although defendants initially followed this procedure, Wonder World stopped submitting weekly reports in September 2017. *Id.* ¶ 19. According to Mr. Helwig, Kiddie Academy contacted defendants on September 19, 2017, and October 3, 2017, and each time the Sumanths stated that they had instructed their bank to withhold the royalty payments. *Id.*

On August 7, 2017 Wonder World and the Sumanths filed suit against Essential Brands, Kiddie Academy's parent, in the Circuit Court for Cecil County, Maryland. *Id.* ¶ 21.  Essential Brands then removed the case to federal court, where it moved to dismiss the action. *See Sumanth*

*v. Essential Brands, Inc*., MJG-17-2450, ECF 7 (D. Md.).  Thereafter, Wonder World voluntarily dismissed the suit on September 29, 2017.  *See id.* at ECF 8.

Pursuant to the Franchise Agreement, Kiddie Academy informed defendants on October 10, 2017, that they had thirty days to cure their breach of the contract for nonpayment.  ECF 49-23, ¶¶ 25-27.  According to Kiddie, on November 13, 2017, after defendants failed to remedy the issue, Kiddie issued Wonder World a Notice of Default Termination of Franchise Agreement ("Notice"), severing the relationship between Kiddie and defendants.  *Id.* ¶ 28; ECF 49-24 (Notice of Termination).

Following the issuance of the Notice, Kiddie disabled Wonder World's access to Kiddie Academy's email servers and to its online system that enabled Wonder World to report enrollees' daily activities to their parents.  ECF 49-23, ¶ 29.  The next day, on November 14, 2017, Kiddie Academy contacted Ms. Sumanth to coordinate the severance of Wonder World's center from Kiddie, including coordinating an in-person meeting where a Kiddie representative could retrieve Kiddie's intellectual property.  *Id.* ¶ 30.  When a Kiddie representative informed Ms. Sumanth that an exterior sign contractor would visit defendants' center on November 17, 2017, to remove Kiddie Academy logos, Ms. Sumanth responded "'we will see about that,' and that she was calling her lawyer."  *Id.* ¶ 33.

In the evening of March 14, 2017, Susan Euteneuer, Kiddie's General Counsel, received an email from Michael D. Smigiel, Sr., Esq., on behalf of defendants, cautioning that if a Kiddie representative appeared at the Cedar Park location without a court order, he or she "will be refused entry onto the premises and deemed trespassers . . . ."  ECF 49-25 at 3; *see also* ECF 49-26 (11/15/2017 email from Ms. Sumanth to Kiddie employee Will Huggins, warning that if he appeared on site, she would call the police).  In order to avoid a confrontation, Kiddie Academy

did not send a representative to Wonder World's Cedar Park location.  ECF 49-23, ¶ 36.  Instead, Kiddie sent a letter to defendants' staff and the families that they serviced, notifying them that Kiddie had terminated its relationship with defendants.  *Id.* ¶ 38.

Defendants ceased operation of their childcare center in November 2017.  ECF 14; ECF 15.  According to Ms. Sumanth, as of October 16, 2019, defendants owe over $2,900,000 in outstanding loans.  ECF 58-2, ¶ 33.  Further, Ms. Sumanth contends that she and Mr. Sumanth invested thousands of dollars in their franchise that they never recouped.  *Id.* ¶¶ 34-38.

## B.  Procedural History

Kiddie initiated this suit on November 16, 2017, asserting claims for breach of the Franchise Agreement and Personal Guaranty as well as for trademark and copyright infringement. ECF 1.  After receiving several extensions of time, defendants' Answer followed on March 26, 2018. ECF 22.  Plaintiff moved to dismiss defendants' counterclaims.  But, Judge Garbis, to whom the case was then assigned, denied the motion and permitted defendants to amend.  ECF 24.

On May 7, 2018, defendants filed a "First Amended Counterclaim And First Amended Third-Party Complaint," lodging multiple claims against Kiddie and nine of its officers.  ECF 25 (the "FAC").   In particular, the FAC was lodged claims against Gregory Helwig, Kiddie's President and Chief Executive Officer; Lene Steelman, Kiddie's Controller/Vice President ("VP") of Accounting; Joshua Frick, Kiddie's VP of Real Estate; David Gould, Kiddie's former Development Manager; Susan Wise, Kiddie's Chief Financial Officer and Chief Operating Officer; Kevin Murphy, the VP of Operations; Chris Commarota, the VP of Construction; Anthony F. Malizia, former Construction Manager; and William Huggins, Franchise Business Consultant. *Id.* ¶¶ 6-15.

The FAC contained ten counts. Count One asserted a claim of "(Intentional Misrepresentation) Fraud or Deceit" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 62-67. Count Two set forth a claim of "(Fraud in the Inducement)" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 68-70. Count Three asserted a claim of "(Intentional Misrepresentation) (Concealment or Non-Disclosure)" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 71-81. In Count Four, counterclaimants asserted "Negligent Misrepresentation" against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 82-88. Count Five, lodged against Kiddie, Commarota, Malizia, and Huggins, asserted "(Defamation Per Se of a Private Individual) Supriya Sumanth." *Id.* ¶¶ 89-92. Count Six contained a claim of "Detrimental Reliance," filed against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy. *Id.* ¶¶ 93-96. Counts Seven, Eight, and Nine alleged RICO violations under 18 U.S.C. §§ 1961 *et seq.*, against Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy, based on mail fraud and wire fraud. *Id.* ¶¶ 97-114. In Count Ten, also under RICO, counterclaimants alleged that Kiddie, Helwig, Steelman, Frick, Gould, Wise, and Murphy conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d). *Id.* ¶¶ 115-20.

Kiddie moved to dismiss the FAC. ECF 27. By Memorandum Opinion (ECF 33) and Order (ECF 34) of March 31, 2019, I granted Kiddie's motion to dismiss in part and denied it in part. As a preliminary matter, I dismissed the claims against the third-party defendants because Wonder World had failed to effect service, as required by Fed. R. Civ. P. 4(m). ECF 33 at 3-4. Thus, I considered the motion to dismiss "only with regard to the Amended Counterclaim filed by the defendants." *Id.*

On the face of the submission, I was unable to conclude that defendants' claims were barred by limitations. *Id.* at 24-28. Therefore, I proceeded to examine plaintiff's contention that the FAC

failed to state claims under Fed. R. Civ. 12(b)(6) and Fed. R. Civ. 9(b).  With the exception of Count Four, I dismissed the counts lodged in the FAC.  ECF 33 at 59.

As relevant here, I concluded that defendants had not alleged plausible fraud claims. With respect to Counts One and Two, I observed: "Critically, defendants fail to provide any facts to support the assertions that Kiddie deliberately made statements with the intent to deceive or for the purpose of defrauding the counterclaimants."  *Id.* at 33.  Equally problematic, defendants rooted their fraud claims in "repeated false assurances and predictions," which "are not actionable for fraud, unless defendants plead with sufficient particularity that such statements were knowingly false or 'made with reckless indifference' to their truth and 'made for the purpose of defrauding' them," something defendants "ha[d] not done."  *Id.* at 35.  Because defendants failed plausibly to allege that Kiddie Academy intended to deceive them, I granted the motion to dismiss with respect to Count One and Count Two.  *Id.*

I also dismissed Count Three.  I observed that in Maryland, to state a claim of fraudulent concealment, the plaintiff must allege that the defendant had a duty to disclose material facts, which arises only "'in certain relationships such as a confidential or fiduciary relationship.'"  *Id.* at 36 (quoting *Hogan v. Md. State Dental Ass'n*, 155 Md. App. 556, 566, 843 A.2d 902, 908 (2004)).  However, I noted that the Franchise Agreement "expressly provided that no fiduciary relationship existed between Kiddie and the counterclaimants," foreclosing defendants' contention that a special relationship existed between them and Kiddie Academy.  ECF 33 at 37.  In addition, I pointed out that Count Three "fails for the same reasons that the other fraud counts fail," *i.e.*, the paucity of allegations that Kiddie Academy intended to deceive counterclaimants.  *Id.*

However, in a generous construction of the FAC, I denied the motion to dismiss Count Four, which contained a claim for negligent misrepresentation.  I agreed with Kiddie Academy

14

that predictive or promissory statements cannot give rise to a claim for negligent misrepresentation under Maryland law. *Id.* at 39. But, I concluded that "counterclaimant's allegations [we]re not entirely limited to promises about future performance or conduct." *Id.* at 40. I stated, *id.*:

> For example, they allege that at the training on April 20, 2015, Conley advised them that "the numbers provided to the bank at Kiddie's direction barely met the minimum lending guidelines for approval, and that it was imperative that Defendants receive the support from Kiddie to reach the given projections." ECF 25, ¶ 54. But, when defendants asked Murphy "to see Kiddie's historical numbers," Murphy refused to "share this historical information due to 'proprietary reasons.'" *Id.* ¶ 55. Conley allegedly explained to the couple that "due to construction cost overruns and an increase in SBA closing costs that the lender had reduced the requested working capital budget." *Id.* Defendants contend, *id.*: "The cost overruns, the increase in SBA closing costs and the increased time to ramp up to break even were due to Kiddie's intentional or negligent provision of information to Defendants to present to the lender."

Thus, "taking the facts in the light most favorable to counterclaimants, I [was] satisfied that counterclaimants' allegations [we]re sufficient to state a plausible claim of negligent misrepresentation." *Id.*

Thereafter, on May 10, 2019, the Court issued a Scheduling Order, pursuant to Local Rule 103.9. ECF 39. Among other things, the Order set a deadline of June 10, 2019, for joining additional parties and amending pleadings. *Id.* at 1. It also set September 9, 2019, as the deadline for discovery and provided that dispositive pretrial motions were due by October 8, 2019. *Id.* at 1-2.

On June 8, 2019, defendants filed a motion to amend the FAC. ECF 40. Wonder World sought to reinstate eight of the nine third-party defendants. *Id.* at 1-2.[2] According to the counterclaimants, their failure to serve the third-party defendants "was due to [their] decision to await the ruling on the motion to dismiss . . . before trying to serve the third-party defendants,

---

[2] Without explanation, defendants state in the Motion to Amend that they "have decided not to pursue" the suit as to William Higgins. ECF 40 at 2.

having chosen first to follow the procedures in Federal Rule of Civil Procedure 4(d)." *Id.* at 1. In addition, relying heavily on statements made by Lisa Conley, defendants sought to reinstate Counts One, Two, and Three, and to amend Count Four. A proposed Second Amended Counterclaim was docketed at ECF 40-2.

On September 9, 2019, the deadline for discovery, the parties filed a joint status report. ECF 43. In the report, defendants informed the Court that "[s]everal" of their discovery requests "remain[ed] outstanding." *Id.* at 2. Although defendants did not request more time to conduct discovery, I referred the case to Magistrate Judge J. Mark Coulson for all discovery and related scheduling matters. *See* ECF 45.

Four days before the dispositive motions deadline of October 8, 2019, and more than one month after the close of discovery, Wonder World filed a motion to compel Kiddie to respond to various interrogatories and requests for production. ECF 48; ECF 48-1. Among other complaints, defendants asserted that Kiddie refused to disclose information concerning the site selection process, preparation of the pro formas, complaints received from other Kiddie franchisees, and the construction of the Sumanths' center. *See* ECF 48-1 at 1-26.

On October 8, 2019, plaintiff filed the Kiddie S.J. Motion (ECF 49) and the J.P. Motion. ECF 50. Judge Coulson denied defendants' motion to compel on October 10, 2019, without prejudice, for failure to comply with the procedures outlined in Local Rule 104.8. ECF 51. However, in light of the "rancor of the correspondence between the parties," Judge Coulson sought to provide guidance as to what he viewed "as the key issue" still outstanding—the scope of discovery regarding defendants' negligent misrepresentation counterclaim in light of my Memorandum Opinion of March 31, 2019. *Id.* at 2.

Judge Coulson observed that the allegations that I discussed in my Memorandum Opinion were merely examples of conduct that could support a claim for negligent misrepresentation. *Id.* at 3.  In his view, other allegations in the FAC could support a negligent misrepresentation claim, including the site selection process, Frick's statement regarding Evolve Bank's research, and whether the numbers provided to the Sumanths by Kiddie Academy were inconsistent with its historical data. *Id.* at 3-4 (citing ECF 22, ¶¶ 24, 34-36, 42, 48, 50-51).  Further, Judge Coulson observed that information concerning plaintiff's breach of contract claim was relevant to defendant's affirmative defenses. *Id.* at 3.

Also on October 10, 2019, Wonder World wrote to Judge Coulson requesting his intervention in the parties' discovery disputes.  ECF 52.  Kiddie submitted a letter brief in response.  ECF 53.  On October 17, 2019, Judge Coulson authorized a "limited extension of discovery" in connection with the topics outlined his Order of October 10, 2019, and directed the parties to "confer and offer a modification to the current schedule."  ECF 54.

On October 25 and 26, 2019, defendants filed their opposition to the Kiddie S.J. Motion and the Kiddie J.P. Motion.  ECF 57; ECF 58.  Kiddie replied shortly thereafter.  ECF 60; ECF 61.

In a Memorandum Opinion (ECF 63) and Order (ECF 64) of November 15, 2019, the Court granted in part and denied in part defendants' motion to amend the FAC.  Pertinent here, I denied defendants' request to revive their fraud claims lodged in Counts One and Two of the FAC, observing that the SAC's fraud claims were predicated on the same conduct pleaded in the FAC, including deficiencies in the pro formas and site analysis; the allegedly misleading email from Mr. Frick; and allegedly false assurances that Kiddie would provide operational support. *Id.* at 19.  However, I found that the SAC, like the FAC, "offer[ed] no specific factual allegations . . . to

support the inference that Kiddie acted with the purpose of defrauding" defendants.  *Id.* at 20.  In light of this "fatal defect," I concluded that the SAC's fraud claims did not clear the hurdle set forth by Fed. R. Civ. P. 9(b).

Likewise, I rejected defendants' attempt to resuscitate their claim for fraudulent concealment, lodged in Count Three.  ECF 63 at 21.  As with the FAC, I determined that the SAC did not plausibly allege that the parties had entered into a confidential relationship, an element of the claim under Maryland law.  *Id.* at 22-23.  I explained, *id.*:

> The conclusory assertion that defendants lacked familiarity with "American culture" and franchising does not, in and of itself, plausibly allege a confidential relationship that can support a claim for fraudulent concealment. The SAC is devoid of facts that indicate that the Sumanths were "wholly dependent" on Kiddie for information. There are no allegations detailing how long the Sumanths have lived in the United States, their educational background, or their business experience or lack thereof. Furthermore, the SAC fails to allege that the information defendants apparently relied on Kiddie to disclose could not have been obtained elsewhere. Many of Kiddie's alleged misrepresentations—for example, the number of teachers required by Texas law, the desirability of a splash pad, or the cost-benefit analysis of constructing a building versus buying an existing one—appear to be things that the Sumanths could easily have verified. There is no basis to assume that they were unable to investigate these matters or exercise due diligence.

On the other hand, I permitted defendants to bolster Count Four, the negligent misrepresentation claim, observing that the proposed allegations "do[] not expand the claim," but rather "clarify[y] the effect of defendants' negligent misrepresentations."  *Id.* at 24.  In particular, I noted that defendants sought to plead that Kiddie made false statements that "induced defendants not only to sign the franchise location, but also to make other business decisions, including selecting Cedar Park, Texas as the location for their franchise and their decision to construct a new building, rather than purchase an existing one."  *Id.*; *see also* ECF 40-1, ¶ 89.

Moreover, I ruled that defendants could pursue negligent misrepresentation claims against Mr. Frick and Ms. Steelman because such claims were not futile.  ECF 63 at 31-34.  With respect

to Mr. Frick, defendants alleged in the SAC that Mr. Frick allegedly misled defendants regarding the quality of the profitability analysis performed by Evolve Bank.  *Id.* at 32 (citing ECF 40-1, ¶ 27).  Regarding Ms. Steelman, Wonder World claimed that Ms. Steelman sent pro formas on two occasions, May 9, 2011, and June 19, 2013, which contained "ascertainable data" that was inaccurate, such as the number of teachers Texas law requires to operate a childcare center, the cost of child-sized toilets, and the cost of payroll and property taxes.  *Id.* (citing ECF 40-1 ¶¶ 21, 24). And, as to both Mr. Frick and Ms. Steelman, defendants alleged that these false statements led them to relocate from California to Texas, to obtain a loan to construct a Kiddie childcare center, and to build the center in Cedar Park, Texas.  *Id.* (citing ECF 40-1, ¶ 33).  Therefore, because these proposed claims were not futile, I ruled that defendants should be allowed to amend the FAC, under Fed. R. Civ. P. 15, to include Mr. Frick and Ms. Steelman.  *See id.* at 33.

Summons were executed as to Mr. Frick and Ms. Steelman on January 1, 2020.  ECF 70; ECF 71.  And, on February 2, 2020, the individual defendants filed their respective motions to dismiss or for summary judgment.  ECF 72; ECF 73.  Defendants responded on January 16, 2020. ECF 74; ECF 75.

Four days later, on January 22, 2020, counsel for defendants wrote to Judge Coulson, requesting that he be allowed to seek discovery from Mr. Frick and Ms. Steelman.  ECF 76.  Kiddie Academy opposed the request.  ECF 77.  By Order of January 28, 2020 (ECF 78) Judge Coulson granted defendants' request in part and denied it in part.

To begin, Judge Coulson observed that despite authorizing a limited extension of discovery and directing the parties to provide him with a joint modification of the Scheduling Order, "the docket does not reflect any proposal by the parties to extend discovery [and] it is not apparent that this occurred."  *Id.* at 1.  "Nonetheless, based on their recent filings," Judge Coulson concluded

"that the parties have engaged in the supplementation envisioned by [his] October 10 Order, and that such process is complete as of Plaintiff's January 17, 2020 production of its remaining tranche of documents." *Id.* However, in light of my Memorandum Opinion permitting defendants to amend their FAC, Judge Coulson found that "some limited and targeted discovery from Frick and Steelman is appropriate." *Id.* at 2. But, he made clear that the scope of discovery was limited to the issues raised in the SAC and identified in my Memorandum Opinion: Mr. Frick's allegedly misleading email on March 24, 2014, concerning Evolve Bank's research and Ms. Steelman's role in crafting the Sumanths' pro formas. *Id.* at 2-3. Accordingly, Judge Coulson set a discovery deadline of March 15, 2020 to allow for depositions of the individual defendants on the "limited issues" previously identified. *Id.* at 3.

On March 10, 2020, defendants filed a motion for sanctions against Kiddie Academy and its counsel under Fed. R. Civ. P. 37(b) and Fed. R. Civ. P. 41(b), asserting that Kiddie and counsel withheld or destroyed materials that defendants sought in discovery, including call logs, reports, meeting minutes, and notes. ECF 84. In support of these allegations, Wonder World submitted a sworn statement from Ms. Conley, averring that Kiddie Academy generated and retained such documents. *See* ECF 84-2. Voluminous briefing followed. *See* ECF 85; ECF 85-1 to ECF 85-23; ECF 86.

Judge Coulson denied defendants' motion for sanctions in an Order of April 8, 2020. ECF 87. Among the reasons Judge Coulson gave for denying defendants' motion, he found its timing suspicious. Ms. Conley had been available to defendants "since at least June 2019," Judge Coulson observed, and yet the motion for sanctions came just a week before the close of the extended discovery period applicable only to Mr. Frick and Ms. Steelman. *Id.* at 7.

More than one month later, on May 21, 2020, defendants submitted the Supplement (ECF

88), which included thirty-nine exhibits.  ECF 88-1 to ECF 88-39.  When Kiddie objected to the filing as an improper surreply (ECF 89), Wonder World replied by filing the Motion to Supplement (ECF 90) and the Motion to Reconsider. ECF 91. Kiddie opposed both motions.  ECF 92; ECF 94.

## II.    The Rule 12(c) Motion

Defendants' Answer, which was docketed in March 2018 at ECF 22, asserts the following affirmative defenses, *id.* at 8: (1) failure to state a claim; (2) "Plaintiff is barred from relief by reason of fraud"; (3) "Plaintiff is barred from relief by reason of fraudulent inducement"; (4) "Plaintiff is barred from relief by unclean hands"; (5) "Plaintiff is barred from relief by its own breach of contract"; (6) "Plaintiff is barred from relief by its inequitable conduct"; and (7) statute of limitations.

Invoking Fed. R. Civ. P. 12(c), Kiddie moved for judgment as to the defendants' affirmative defenses in October 2019, asserting that they are not supported by factual allegations and thus are implausible.  ECF 50-1 at 6-10.  In response, defendants posit that the J.P. Motion is best understood as a motion to strike under Fed. R. Civ. P. 12(f), and such motions are disfavored. ECF 57 at 2.  Further, defendants defend the plausibility of their affirmative defenses, arguing that there are ample factual allegations to support its position that Kiddie is barred from relief because it engaged in fraudulent conduct and breached the Franchise Agreement.  *Id.* at 3-4.

Rule 12(c) of the Federal Rules of Civil Procedure provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A motion under Rule 12(c) is "assessed under the same standard that applies to a Rule 12(b)(6) motion." *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)); *see also McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010).  Thus, the reviewing court must accept the allegations as true and draw all reasonable

inferences in favor of the nonmoving party.  *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011).

Rule 12(d) is also pertinent.  It provides that, if matters outside the pleadings are presented to and not excluded by the court, a Rule 12(c) "motion must be treated as one for summary judgment . . . ."  Neither side relies on Rule 12(d), however.

To my knowledge, neither the Supreme Court nor the Fourth Circuit has addressed whether the pleading standard elucidated in the canonical cases of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), extends to affirmative defenses.  *See Alston v. AT&T Servs., Inc.*, GJH-18-2529, 2019 WL 6684131, at *2 (D. Md. Dec. 5, 2019) (recognizing that this open question); *see also United States v. All Assets Held at Bank Julius*, 229 F. Supp. 3d 62, 70 (D.D.C. 2017) (acknowledging that this issue remains unresolved in nearly every circuit).  Some courts within the Fourth Circuit have declined to apply *Twombly* and *Iqbal*'s plausibility test to affirmative defenses.  *See, e.g.*, *Keith Bunch Assocs., LLC v. La-Z-Boy Inc.*, No. 1:14-cv-850, 2015 WL 4158760, at *2 (M.D.N.C. July 9, 2015) (concluding that an affirmative defense is sufficiently plead "as long as the [defense] gives the plaintiff fair notice of the nature of the defense").

That said, courts in this District, myself included, have concluded that the standard applicable to affirmative defenses tracks the *Iqbal/Twombly* standard.  *See Brandsafway Servs., LLC v. Manolis Painting, Inc*, RDB-18-2016, 2019 WL 4415740, at *3 (D. Md. Sept, 16, 2019); *Ulyssix Techs., Inc. v. Orbital Network Eng'r, Inc*, ELH-10-2091, 2011 WL 631145, at *15 (D. Md. Feb. 11, 2011); *Bradshaw v. Hilco Receivables, LLC*, 725 F. Supp. 2d 532, 536 (D. Md. 2010). Under this standard, the defendant does not need to provide all supporting evidentiary facts to allege adequately an affirmative defense, but "'some statement of the ultimate facts underlying the

defense must be set forth, and both its non-conclusory factual content and the reasonable inferences from that content, must plausibly suggest a cognizable defense available to the defendant.'" *Brandsafway Servs.*, 2019 WL 4415740, at *3 (ellipses and citation omitted).

Against this doctrinal backdrop, I shall grant Kiddie judgment as to some—but not all—of defendants' affirmative defenses.  Defendants' first affirmative defense—"failure to state a claim"—warrants dismissal because this defense "must be made before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b)(6).  Here, however, instead of moving to dismiss Kiddie's Complaint, defendants filed an Answer.  Therefore, the time to assert this defense has expired.

Defendants' affirmative defenses predicated on fraud must also be dismissed.  This Court has assessed defendants' fraud counterclaims twice. ECF 33; ECF 63.  And, both times I have determined that defendants failed to allege plausible fraud claims.  Thus, for the same reasons that defendants cannot pursue counterclaims for fraud, they cannot allege fraud as a shield against Kiddie's suit.

However, I take a different view of the remaining affirmative defenses: "unclean hands," "inequitable conduct," limitations; and breach of contract.  Defendants have persistently claimed that Kiddie did not abide by its promises and acted with unclean hands and inequitably.  Plaintiff is not entitled to judgment on the pleadings as to these claims.  *See Brandsafway Servs*., 2019 WL 4415740, at *3.  As for limitations, the defense is not appropriate for resolution at this juncture.

Accordingly, I shall grant the J.P. Motion only as to defendants' affirmative defenses for failure to state a claim and fraud.

### III.   Motion to Reconsider

Nearly five months after the briefing of the dispositive motions, defendants submitted a 22-page "Supplemental Submission of Supplemental Affidavit of Lisa J. Conley and Other Evidence in Opposition to Memorandum of Law in Opposition to Joshua Frick and Lene Steelman's Motion to Dismiss Second Amended Counterclaim, or in the Alternative, Motion For Summary Judgment and Memorandum of Law in Support of Motion for Reconsideration of the Dismissal of Counts One, Two, and Three."  ECF 88.  When Kiddie opposed the filing as an improper surreply (ECF 89), defendants filed two additional motions—the Motion to Supplement (ECF 90) and a Motion to Reconsider.  ECF 91.

In the Motion to Reconsider, defendants assert that new evidence obtained since the Court's Memorandum Opinion of November 15, 2019, reveals that Kiddie acted with the intent to deceive defendants, and therefore defendants should be permitted to pursue their fraud claims.  *Id.* at 2.  Further, defendants aver that this recently acquired evidence shows that Kiddie Academy was the "sole source" of "closely guarded information" used to prepare the pro formas on which the Sumanths relied to obtain a loan, which they insist establishes the confidential relationship necessary to support their fraudulent concealment claim.  *Id.*

Defendants' Motion to Reconsider is both untimely and without merit.  To start, the deadline to seek reconsideration has long since passed.  With exceptions not applicable here, Local Rule 105.10 provides that "any motion to reconsider any order issued by the Court shall be filed with the Clerk not later than fourteen (14) days after entry of the order."  I initially dismissed defendants' fraud counterclaims in a Memorandum Opinion and Order of March 31, 2019.  *See* ECF 33; ECF 34.  Plaintiff then sought to revive those claims, but I denied that request in my Memorandum Opinion and Order of November 15, 2019.  ECF 63; ECF 64.  Pursuant to Local

Rule 105.10, the window for reconsideration closed on November 29, 2019.  However, defendants did not file the Motion to Reconsider until June 2, 2020—six months too late.  This alone is grounds to deny the Motion to Reconsider.  *See Direct Benefits, LLC v. TAC Fin., Inc.*, RDB-13-1185, 2019 WL 3804513, at *4 (D. Md. Aug. 13, 2019) (Copperthite, M.J.) ("This Court has held that untimeliness is sufficient to warrant denial of a motion for reconsideration."); *accord Humane Soc'y of U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, DKC-13-1822, 2017 WL 1426007, *5 (D. Md. Apr. 21, 2017) (denying motion for reconsideration where it was untimely filed and the plaintiff "offer[ed] no persuasive justification for suspending Local Rule 105.10").

Moreover, there is no basis to disturb my earlier rulings under the law of the case doctrine. That doctrine serves as a rule of decision.  The law of the case doctrine  "generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, ___ U.S. ___, 136 S. Ct. 709, 716 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)); *accord Arizona v. California*, 460 U.S. 605, 618 (1983); *Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019); *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017); *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009).  Put differently, a legal decision, once made, should ordinarily remain the law throughout the life of the case.  *See* 18B C. WRIGHT, A. MILLER, & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2020).

The doctrine's effect is to bar a party from resurrecting issues that were previously decided or "'decided by necessary implication.'" *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008) (quoting *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988)).  In so doing, the law of the case doctrine advances the interests of efficiency and judicial economy.  *Christianson v. Colt Indus. Oper. Corp.*, 486 U.S. 800, 816 (1988) (observing that the doctrine safeguards the

"efficiency of the judicial process by protecting against the agitation of settled issues"); *Sejman*, 845 F.2d at 69 (recognizing that "courts could not perform their duties 'satisfactorily and efficiently'" if issues "'once considered and decided . . . were to be litigated anew in the same case'") (citation omitted). Moreover, the doctrine bolsters public confidence in the judiciary by providing parties with consistency and finality. *See United States v. Philip Morris USA Inc.*, 801 F.3d 250, 257 (D.C. Cir. 2015) (noting that the law of the case doctrine, "reflects the understanding that 'inconsistency is the antithesis of the rule of law'") (citation and alteration omitted); WRIGHT, MILLER, & COOPER, *supra*, § 4478 (identifying consistency as one of the doctrine's salutary aims).

As relevant here, the law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided" by the court in the same case. *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.). For instance, courts regularly decline to revisit transfer decisions rendered by the transferor court. *See Christianson*, 486 U.S. at 816 (recognizing that a contrary rule would "threaten to send litigants into a vicious circle of litigation"). And, as the Fourth Circuit has explained, the law of the case doctrine applies to interlocutory rulings, notwithstanding the fact that such decisions are amenable to revision, pursuant to Fed. R. Civ. P. 54. *See Carlson*, 856 F.3d at 325 (holding that "a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case").

This application of the law of the case doctrine "is not an 'inexorable command' but rather a prudent judicial response to the public policy favoring an end to litigation." *Sejman*, 845 F.2d at 68 (citation omitted); *see Christianson*, 486 U.S. at 817 (making clear that the doctrine does not limit a court's power); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"). The doctrine, when applied by a trial court to its own rulings, is thus

"malleable," and the court should be mindful of the need to "balance the interests of correctness and finality." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003).

That said, courts should be "loathe" to revisit settled decisions of law absent "extraordinary circumstances." *Christianson*, 486 U.S. at 817.   Accordingly, the Fourth Circuit has instructed that "a court may revise an interlocutory order under the same circumstances in which it may depart from the law of the case: (1) 'a subsequent trial producing substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" *Carlson*, 856 F.3d at 325 (quoting *Canoe Ass'n*, 326 F.3d at 515) (brackets omitted); *see also Lentz*, 524 F.3d at 528 *Sejman*, 845 F.2d at 68.   In this setting, the Fourth Circuit has colorfully explained that to be clearly erroneous the decision cannot be "'just maybe or probably wrong; it must . . . strike [the court] as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *TFWS*, *Inc.*, 572 F.3d at 194 (first alteration in original) (citation omitted).

Defendants do not point to any intervening changes in Maryland law that require the Court to revisit its prior rulings. Nor do they contend that a trial has produced evidence that warrants reconsideration.  Instead, defendants strenuously argue that the Court's prior rulings have become erroneous in light of "new" evidence, namely a supplemental affidavit from Conley and an "Unemployment Insurance Appeals Decision" issued on December 21, 2016, by the Maryland Department of Labor, Licensing and Regulation in connection with a claim Conley brought following her termination against Kiddie Academy's corporate owner, Essential Brands, Inc.  *See* ECF 88 at 2; ECF 91 at 2; *see also* ECF 88-3 (Conley Sworn Statement 3/6/2020); ECF 88-4 (Unemployment Appeals Decision).  This contention is misguided.

Regarding the proposed fraud claims, defendants previously submitted an affidavit from Ms. Conley in support of the SAC. *See* ECF 40-3.  However, after reviewing Ms. Conley's

statements, I determined that the conduct that she attributed to Kiddie Academy did not plausibly support the inference that Kiddie acted with an intent to deceive. *See* ECF 63 at 20. And, as to defendants' fraudulent concealment claim, I rejected as implausible defendants' contention that they were wholly reliant on Kiddie Academy to generate the proformas because much of the allegedly inaccurate data "could easily have [been] verified," and there was "no basis to assume that [the Sumanths] were unable to investigate these matters or exercise due diligence." *Id.* at 23. None of defendants' so-called new evidence undermines these conclusions.

And, in any event, this evidence is hardly new. Defendants had access to Ms. Conley as early as June 2019. *See* ECF 40-3. The employment decision was not only rendered well before this suit began, but it was referenced in the proposed SAC. ECF 40-2, ¶ 64. In sum, I see no error in my prior rulings.

Accordingly, I shall deny defendants' Motion to Reconsider.

## IV.    Motion to Supplement

As noted, in addition to filing a surreply, defendants moved to supplement the record with a memorandum of law as well as thirty-nine exhibits. ECF 88; ECF 88-1 to ECF 88-39; ECF 90. In the Motion to Supplement, defendants argue that "the interests of justice" mandate consideration of their "admittedly late submissions to assure the they get their day in Court to have their story fully told and considered on the merits." ECF 90 at 2. According to defendants, Kiddie, Mr. Frick, and Ms. Steelman cannot complain about the late filing because they have sought at "every turn" to "block Defendants from getting the discovery necessary to prove their case." *Id.* at 1. Further, defendants posit that "there is no harm whatsoever to Kiddie Academy, Frick or Steelman by allowing the Court to consider this submission and the motion for reconsideration," given the COVID-19 pandemic, which prompted the extension of filing deadlines. *Id.* at 2.

Kiddie Academy disagrees.  In its view, the Court should decline to entertain the Motion to Supplement and related submissions, on the ground that the memorandum is an "unauthorized and improper" surreply, citing Local Rule 105.2(a).  ECF 89 at 2.

Local Rule 105.2(a) provides: "Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."  Leave to file a surreply is granted sparingly.  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013) (observing that surreplies are "generally disfavored"), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g.*, *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013).  A surreply may be permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply.  *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted).  But, a surreply is not generally permitted where the reply is responsive to an issue raised in the opposition.  *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605-06 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).

I agree with Kiddie that defendants' memorandum, docketed at ECF 88, and the Motion to Supplement, docketed at ECF 90, are improper surreplies.  Defendants do not contend that Kiddie, Mr. Frick, or Ms. Steelman raised new arguments in their reply briefs.  Nor are the submissions directly responsive to arguments raised by Kiddie, Mr. Frick, or Ms. Steelman.  Instead, these filings reiterate defendants' belief that the have viable fraud claims against Kiddie.  That is a contention that this Court has twice rejected.  *See* ECF 88 at 19-21.  In addition, defendants' attempt to excuse the untimeliness of these filings is unpersuasive.  The COVID-19 pandemic cannot justify the belated filings. Briefing concluded in January 2020; the coronavirus, however, did not become a national emergency until March 2020. *See* Proclamation on Declaring a National

Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://bit.ly/3gua1kO.   Finally, defendants utterly failed to comply with Local Rule 105.2's straightforward requirement that a party obtain leave of Court *before* filing a surreply.

Therefore, I shall not consider the arguments raised in ECF 88 and ECF 91, as they constitute improper surreplies.  However, given the winding procedural history of this case, which entailed several extensions of the discovery period and the late addition of new third-party defendants, I shall consider the depositions of Frick and Steelman, which are attached as exhibits to ECF 88, in assessing the various motions for summary judgment.

## V.   Summary Judgment Motions

### A.  Standard of Review

Kiddie has moved for summary judgment as to Wonder World's negligent misrepresentation counterclaim.  ECF 49.  In contrast, both Mr. Frick (ECF 72) and Ms. Steelman (ECF 73) have each filed a motion to dismiss or, in the alternative, for summary judgment.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and

submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[3]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." WRIGHT ET AL., *supra*, § 1366. This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

---

[3] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub. nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x. 378 (4th Cir. 2013) (per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity

for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

In opposing the Frick Motion and Steelman Motion, defendants assert that converting the motions to summary judgment is inappropriate because they have not had an opportunity to depose either Mr. Frick or Ms. Steelman.  *See* ECF 74 at 4; ECF 75 at 4.  And, invoking "Federal Rule of Civil Procedure 56(f),"[4] Wonder World contends that the "Supplemental Affidavit" of Ms. Sumanth, attached to each opposition (ECF 74-1; ECF 75-1), highlights the need for further discovery.  These arguments are unavailing.

Rule 56(d) is not a talisman, the incantation of which precludes the conversion of a motion to dismiss to one for summary judgment.  *See Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (finding that district court did not err where Rule 56 affidavit did pointed to no relevant

---

[4] "By amendment that took effect on December 1, 2010, former Rule 56(f) was carried forward into subdivision (d) without substantial change."  *Greater Balt. Ctr. for Pregnancy Concerns, Inc., v. Mayor of Balt.*, 721 F.3d 264, 275 n.6 (4th Cir. 2013) (en banc).

undiscovered evidence); *Patrick v. PHH Mortg. Corp.*, 998 F. Supp. 2d 478, 486 (N.D. W. Va. 2014) (denying Rule 56(d) motion).  Further, the one-page affidavit filed by Ms. Sumanth does not reference discovery or address why defendants cannot properly oppose the motions for summary judgment.  Therefore, it cannot serve as a Rule 56(d) affidavit.

Nonetheless, defendants' opposition briefs, which identify issues that they believe warrant discovery, "'serve[] as the functional equivalent of an affidavit.'"  *Harrods*, 302 F.3d at 245 (citation omitted).  Specifically, in opposing the Frick Motion defendants aver that they need to depose Frick to "to find out exactly what he and Kiddie Academy did in coming up with the Site Analysis Report for the Cedar, Park, Texas site . . . why he and Kiddie Academy childcare thought that Evolve Bank had erred in evaluating the site . . . and why he misled Defendants into thinking that Evolve Bank was mistaken in determining that the risk was too great to make the loan they had applied for."  ECF 74 at 5.  As to Steelman, defendants contend that deposing Steelman is necessary to "find out how she determined certain information to be put into the proformas and why she did not include other information . . . ."  ECF 75 at 4.  Thus, defendants have given the Court notice of the outstanding discovery that they believe is essential to their opposition.

The problem is that Rule 56(d) does not protect nonmovants "where they had the opportunity to discover evidence but chose not to."  *McCray*, 741 F.3d at 483; *see also Pisano*, 743 F.3d at 932 (affirming district court's denial of Rule 56(d) motion in part because the court "gave Plaintiffs ample opportunity to offer additional affidavits before considering the summary judgment motion, but Plaintiffs simply chose not to do so"); *White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 295 n.2 (4th Cir. 2004) (rejecting nonmovants argument that conversion to summary judgment was erroneous where the record established that they "had not exercised the required level of diligence in obtaining discovery during the discovery period"); *Patrick*, 998 F. Supp. 2d

at 486 (denying Rule 56(d) motion, reasoning that "Plaintiffs' inability to gather evidence to respond to Defendant's Motion for Summary Judgment is due to their own delay").  Here, Kiddie contends that Wonder World never served notices of deposition or issued subpoenas to Mr. Frick or Ms. Steelman during the initial discovery period, which spanned from May 10 to September 9, 2019.  ECF 62 at 10.  Defendants do not dispute that assertion.  In short, defendants cannot complain that they lack evidence to oppose summary judgment when they were dilatory in pursuing discovery.

In any event, Judge Coulson reopened discovery on January 28, 2020, giving Wonder World until March 15, 2020, to pursue discovery from Mr. Frick and Ms. Steelman. ECF 78.  Thereafter, defendants deposed Mr. Frick on February 28, 2020, and Ms. Steelman on March 2, 2020.  *See* ECF 88-13 (Frick deposition); ECF 88-39 (Steelman deposition).  And, defendants submitted excerpts of these depositions as attachments to their Motion to Supplement.  Therefore, defendants have been afforded the opportunity to conduct the very discovery that they sought in their oppositions. Accordingly, I am satisfied that it is appropriate to address the Frick Motion and the Steelman Motion as ones for summary judgment, as this will facilitate the resolution of this case.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009);

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

 "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d

327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018);  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *accord Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

### B.  The Kiddie S.J. Motion

In both the FAC and the SAC, defendants lodged a counterclaim against Kiddie for negligent misrepresentation under Maryland law, asserting that plaintiff owed Wonder World a duty to provide accurate information concerning the selection, construction, and operation of the franchise and Kiddie repeatedly breached that duty throughout the parties' business relationship.

ECF 25, ¶¶ 82-92; ECF 40-2, ¶¶ 87-94.  Defendants claim that Kiddie induced them to enter into a franchisor-franchisee relationship by falsely representing that Kiddie's curriculum was superior to its competitors, that the Sumanths would be successful despite their lack of industry experience, and that Kiddie would guide the Sumanths through the construction process.  ECF 40-2, ¶¶ 27, 29, 31.  Further, Kiddie allegedly induced defendants to select Cedar Park for the location of their franchise based on SARs that were "not accurate" and "failed to accurately consider the competition and the necessary demographic data" of the area.  *Id.* ¶ 41.

Even after defendants had settled on a location for their franchise, Kiddie's misrepresentations allegedly continued.  Defendants assert that Mr. Frick wrongly derided Evolve Bank's research, which "deceiv[ed] Defendants further into believing that they had good business prospects . . ."  *Id.* ¶ 26.  Kiddie allegedly misled the Sumanths with "false pro formas" that "overestimated tuition revenue and underestimated expenses," including the cost of a splashpad, number of teachers, and the cost of credit card processing.  *Id.* ¶¶ 21, 23.  And, Kiddie allegedly made "numerous mistakes" during the construction process, *id.* ¶ 50, including failing to account for the cost of a splash pad and not informing the Sumanths of various licensing requirements.  *Id.* ¶¶ 53-54, 56.

 In my Memorandum Opinion of November 15, 2019 (ECF 63), I observed that the allegations in the SAC pertaining to defendants' negligent misrepresentation counterclaim allege "only that Kiddie had a duty to speak truthfully throughout the relationship, and that Kiddie's false statements induced defendants not only to sign the franchise location, but also to make other business decisions, including selecting Cedar Park, Texas as the location for their franchise and their decision to construct a new building, rather than purchase an existing one."  *Id.* at 24.  "In other words, I explained, "the proposed language clarifies the effect of defendants' negligent

misrepresentations; it does not expand the claim." *Id.* Therefore, because defendants' negligent misrepresentation counterclaim lodged in the FAC and the SAC are coterminous, Kidde's S.J. Motion, which was filed before I issued my Memorandum Opinion, applies with equal force to the negligent misrepresentation claim lodged in the SAC.[5]

The Maryland Court of Appeals set forth the elements of a claim for negligent misrepresentation in *Lloyd v. General Motors Corp.*, 397 Md. 108, 916 A.2d 257 (2007). They are, *id.* at 138, 916 A.2d at 274 (quotation marks omitted):

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Numerous Maryland cases are to the same effect. *See*, *e.g.*, *Griesi v. Atl. Gen'l Hosp. Corp.*, 360 Md. 1, 11, 765 A.2d 548, 553 (2000); *Valentine v. On Target*, 353 Md. 544, 549, 727 A.2d 947, 949 (1999); *BG & E v. Lane*, 338 Md. 34, 43, 656 A.2d 307, 311 (1995); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 336-37, 439 A.2d 534, 539 (1982); *Va. Dare Stores v. Schuman*, 175 Md. 287, 291-92, 1 A.2d 897, 899 (1938); *see also All Med. Personnel, Inc. v. Ameritox, LLC*, 18-CCB-1527, 2018 WL 5810866, at *2 (D. Md. Nov. 6, 2018); *Heritage Oldsmobile-Imports v. Volkswagen of Am., Inc.*, 264 F. Supp. 2d 282, 290-91 (D. Md. 2003).

Kiddie Academy argues that it is entitled to summary judgment, focusing principally on the pro formas. ECF 49-1 at 10. According to Kiddie, the pro formas cannot support a claim for negligent misrepresentation because they are merely estimates, contain disclaimers, and, in any

---

[5] Indeed, in the Memorandum Opinion of November 15, 2019, I acknowledged Kiddie's pending motion for summary judgment and said: "I express no opinion as to the merits of that motion." ECF 63 at 26 n.6.

event, do not contain false information. *Id.* at 11-14.  In addition, Kiddie maintains that the record is devoid of admissible evidence establishing that defendants' reliance on the pro formas was the proximate cause of their claimed damages. *Id.* at 14-19.  As to defendants' other assertions, Kiddie contends that there is no evidence in the record that Kiddie made false statements during the site selection and construction process because the Conley Affidavit and Sumanth Affidavit are conclusory, self-serving, and inadmissible.  ECF 62 at 2-9.

Defendants counter that there are genuine issues of material fact as to whether "Kiddie made direct misstatements of facts, omitted other material facts . . . and made mistakes which proximately caused [the Sumanths] to go forward with their bank loan and spend the monies that they spend on construction, marketing and operation of the Cedar Park Kiddie Academy childcare center." ECF 58 at 14.  To support their view, defendants rely heavily on Ms. Sumanth's Affidavit, particularly her statements that Kiddie falsely touted its curriculum and that no knowledge of the childcare industry was necessary to be successful; that Mr. Frick falsely stated that Evolve Bank had done insufficient research in denying the Sumanth's loan; and that the construction process was plagued by cost overruns. *Id.* at 2-9.  And, relying on the Conley Affidavit, defendants assert that the parties genuinely contest whether the pro formas contain false information. *Id.* at 9-14.  As to causation, defendants assert that there can be no dispute that Kiddie's false statements caused the Sumanths to obtain a loan and deplete their personal assets in furtherance of opening a Kiddie franchise. *Id.* at 17-21.

On the record before the Court, there is insufficient evidence to support defendants' assertion that Kiddie made a false statement on which defendants could reasonably rely.  Thus, because there are no genuine issues of material fact on that score, Kiddie is entitled to summary judgment as to defendants' counterclaim.

At the outset, Kiddie's promotional statements cannot support a misrepresentation claim. "It is axiomatic that a claim for negligent misrepresentation requires a false statement of material fact." *Ameritox, LLC*, 2018 WL 5810866, at *2 (applying Maryland law). Thus, as other courts in this District have recognized, "Maryland law distinguishes between statements that relate to material facts—which may give rise to cognizable claims—and vague generalities, statements of opinion, or puffery—which are deemed non-cognizable." *Baney Corp. v. Agilysis NV, LLC*, 773 F. Supp. 2d 593, 608 (D. Md. 2011); *see Anne Arundel Cty. v. Xerox State & Local Sols., Inc.*, JFM-16-0563, 2016 WL 5720705, at *6 (D. Md. Sept. 30, 2016); *Daniyan v. Viridian Energy LLC*, GLR-14-2715, 2015 WL 4031752, at *3 (D. Md. June 30, 2015). For instance, in *Milkton v. French*, 159 Md. 126, 150 A. 28 (1930), the Maryland Court of Appeals determined that a seller who represented to a potential home buyer that a building was "perfectly safe on the concrete, roof and everything else of the construction" was not liable for fraud, because the claim of perfect construction "was so extravagant in scope and measure and so indefinite and elusive in meaning that the statement would fall within the category of a puff instead of a representation." *Id.* at 31, 150 A. 28. Similarly, the Maryland Court of Special Appeals has found that an attorney's statement that he might sell his law firm below market value when he retired was too "vague and general [a] statement" to be a statement of fact. *Goldstein v. Miles*, 159 Md. App. 403, 436, 859 A.2d 313, 332 (2004). The court explained that vague and exaggerated statements cannot support a negligent misrepresentation claim "'because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements.'" *Id.* (quoting *Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344 (1962)).

The distinction between facts and puffing dooms defendants' contention that Kiddie induced them to enter into a franchisor-franchisee relationship. These statements include Kiddie's

representations that "owner operators of its franchises did not need any training or experience as Kiddie provided all training," ECF 58-2, ¶ 6; its curriculum "was as good or better than its best competitor," *id.* ¶ 7; and, Kiddie had a "platform which would guide [the Sumanths] to success." *Id.* ¶ 26.  None of these statements convey concrete facts amenable to verification.  Rather, they are puffery.

No reasonable person could believe that Kiddie would provide "all" of the training necessary to successfully operate a childcare center.  Nor would a reasonable person believe that her inexperience in the childcare industry would have no bearing as to her likelihood of success in operating a childcare franchise.  Because these statements are not ones of fact, they cannot be false. *See Baney Corp.*, 773 F. Supp. 2d at 609 (statements that property management system was "easy to use" and was "perfect for a multi-property environment" were not statements of fact); *Steigerwald v. Bradley*, 136 F. Supp. 2d 460, 469-70 (D. Md. 2001) (loan officer's statements that the defendant was one of the bank's "biggest and best customers" was puffing).

To the extent that defendants relied on these statements, Maryland law would find their reliance unreasonable.  Certainly, reasonable reliance is a "slippery" concept because of its factual nature. *Parker v. Columbia Bank*, 91 Md. App. 346, 361, 604 A.2d 521, 528 (1992).  "In determining if reliance is reasonable, a court is required to 'view the act in its setting,'" *Sass v. Andrew*, 152 Md. App. 406, 441, 832 A.2d 247, 267 (2003) (citation omitted), and consider factors such as "the background and experience of the party that relied upon the representation." *Goldstein*, 159 Md. App. at 437, 859 A.2d at 333.  Put differently, the question is whether, "'under the circumstances, the facts should be apparent to a person of the plaintiff's knowledge and intelligence from a cursory glance or he has discovered something which should serve as a warning

that he is being deceived.'"  *Rozen v. Greenberg*, 165 Md. App. 665, 677, 886 A.2d 924, 931 (2005) (cleaned up; citation omitted), *cert. denied*, 391 Md. 579  (2006).

Here, however, no reasonable fact finder could conclude that the Sumanths were justified in relying on this kind of sales talk.  Ms. Sumanth has an MBA, six years of work experience as  a financial analyst, and is familiar with business and accounting principles.  ECF 58-2, ¶¶ 2-3; *see also* ECF 58 (asserting that Ms. Sumanth is an "intelligent, well-educated layperson" who is "qualified to testify as to their losses, expenses, and investments in the business").  And, Kiddie's sales statements were so vague and patently puffery that the Sumanths could not have put much stock in them.  Indeed, no one in Ms. Sumanth's position could view Kidde's representations that its curriculum was the best or that a franchisee's total inexperience in the relevant industry was immaterial as anything other than bravado.  Accordingly, Kiddie's puffery is not actionable as negligent misrepresentations.

Defendants' reliance on the SARs is similarly unavailing.  In her Affidavit, Ms. Sumanth avers that the SARs were "not accurate" because they "failed to accurately consider the competition and the necessary demographic data including income levels of the residents of the area."  ECF 58-2, ¶ 13.  But, Ms. Sumanth's contention is belied by documentary evidence in the record.  In particular, the SARs that Kiddie compiled for 1602 Medical Parkway and the other two locations that the Sumanths considered in Austin, Texas contain the very data that Ms. Sumanth claims was lacking.  *See* ECF 62-1; ECF 62-2; ECF 62-3.  Regarding competition, the SAR for the Medical Parkway location listed over 50 potential competitors within a five-mile radius of  the proposed Kiddie franchise. *See* ECF 62-1 at 12-13.  As for demographics, the SAR contained a rich data set, including number of businesses broken down by industry, population growth, median

household income, and median home value, for a 1-mile, 3-mile, and 5.5-mile radius of the proposed site. *Id.* at 5

As the Supreme Court has instructed, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, Ms. Sumanth's version of the facts regarding the SARs "is blatantly contradicted by the record."  Therefore, the Court declines to adopt them for the purposes of ruling on Kiddie's Motion. *Id.*; *see also Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (to defeat summary judgment, the "nonmoving party must rely on more than conclusory allegations, [or] mere speculation"); *Coleman v. Loudon Cty. Sch. Bd.*, 294 F. App'x 778, 782 (4th Cir. 2008) (noting that "self-serving, unsubstantiated opinions" are "insufficient to stave off summary judgment").

Similarly, defendants' claim cannot rest on Mr. Frick's email concerning Evolve Bank's research.  As discussed above, Mr. Ruiz, as associate from Evolve Bank, informed Ms. Sumanth on March 23, 2014, that Evolve Bank was concerned with the profitability of a childcare center located on Medical Parkway.  ECF 72-16 at 2.  The next day, after Evolve Bank declined to issue defendants a loan, Mr. Frick wrote to Ms. Sumanth, *id.* at 39: "I don't think they did very good research themselves which caused us to have to justify our decision logic. Had they done the proper research they would have come to the same conclusion as us.  It is kind of ironic."  Ms. Sumanth replied, *id.*: "I completely agree."

In defendants' view, Mr. Frick's criticism is a false statement which induced defendants to pursue and obtain a loan from Square 1 Bank.  ECF 58-2, ¶¶ 14-17; ECF 74 at 11-12.  But, defendants place more weight on this email than it can bear.  For one thing, Mr. Frick's statement

is plainly an opinion, not a statement of fact.  Defendants insist that Mr. Frick's email advances a "factual determination that Evolve Bank had not done the proper research."  ECF 74 at 12.  Yet, that assertion ignores the words Mr. Frick used.  His email begins with the qualifier "I don't think"—words that clearly communicate the subjective nature of the assertion that follows.  And, the assertion that follows—that the Bank's research was not "very good" and not "proper"—also expresses a point of view.  Indeed,  the fact that Mr. Frick's statement is incapable of being proven or disproven confirms that it is a point of view, not a factual observation.  Thus, I cannot find a factual representation in the email to support a claim for negligent misrepresentation.

Moreover, the record makes clear that the Sumanths did not rely on Mr. Frick's email.  To the contrary, Ms. Sumanth disagreed with Evolve Bank's analysis before Mr. Frick voiced his opinion.  On her own accord, Ms. Sumanth wrote to Mr. Ruiz to point out several flaws that she perceived in Evolve Bank's analysis.  ECF 72-16 at 37.  In fact, she enlisted Mr. Frick's help in persuading Mr. Ruiz to junk the bank's analysis.  *See id.* at 34 (requesting Mr. Frick to email Mr. Ruiz because there was "some convincing to do on the location for our center").  And, when Mr. Frick opined that Evolve Bank had bungled its site analysis, Ms. Sumanth "completely agree[d]" with his analysis.  *Id.*  Consequently, putting aside that the Mr. Frick's statement is an opinion, no reasonable fact finder could believe that Ms. Sumanth was swayed by his email of March 24, 2014.

For the same reasons, defendants' allegations predicated on the pro formas come up short. As an initial matter, a pro forma is a financial estimate—that is, a projection premised on a pile of assumptions and historical data.  *See Pro Forma*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining a pro forma as a "financial statement . . . provided in advance to describe items, predict results, or secure approval"); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 378 n.3 (1983) ("A pro forma balance sheet is one prepared on the basis of assumptions as to future

events.").   To be sure, Kiddie's pro formas are materially different from the puffery discussed above.   But, the detailed nature of the pro forma does not change the fact that they are, by their nature, statements of expectation, not of fact.   *See In re Clarkeies Mrkt., LLC*, 322 B.R. 487, T (D. N.H. 2005) (rejecting negligent misrepresentation claim predicated on false pro formas, reasoning, in part, that pro formas are "by definition, projections of what might happen in the future based").

Even assuming that the pro formas constitute false statements, there is no genuine dispute of material fact that, to the extent that the Sumanths believed the pro formas were grounded in facts, such a belief was not justified.   First, the Sumanths, in collaboration with Ms. Steelman and Ms. Conley, repeatedly tinkered with the pro forma over the course of a year.   Indeed, the pro forma underwent more than five revisions.   *See* ECF 49-6 (9/23/2013 pro forma); ECF 49-9 (1/10/2014 pro forma); ECF 49-10 (1/30/2014 pro forma); ECF 49-11 (2/6/2014 pro forma); ECF 49-16 (9/30/2014 pro forma); ECF 49-19 (10/14/2014 pro forma); ECF 49-20 (11/5/2014 pro forma); ECF 49-21 (11/10/2014 pro forma).   For instance, the estimated number of school-age children enrolled at defendants' center during its first year of operation vacillated from 14 in September 2013, ECF 49-6 at 7; to 16 in January 2014, ECF 49-10 at 42; to 17 in February 2014, ECF 49-11 at 7; up to 20 in September 2014, ECF 49-16 at 31; and then back down to 17 in November 2014, ECF 49-21 at 9.   Such frequent changes should have put Ms. Sumanth on notice that the pro formas were malleable and trended optimistic, not conservative.

Further, email correspondence between Ms. Sumanth and Ms. Steelman reveals that Ms. Sumanth felt empowered to exercise editorial control over the pro formas.   For example, in October 2013, Ms. Sumanth informed Ms. Steelman that she had "lowered the tuition rates" on the pro forma because she "felt the ones previously entered could be on the high end for the market." ECF 49-6 at 2.   When Ms. Steelman revised the pro forma shortly thereafter, Ms. Sumanth did not

simply accept the changes, but instead told Ms. Steelman that the pro forma "d[id] not look good." ECF 49-8 at 2.  Other emails similarly demonstrate that Ms. Sumanth was actively involved in generating the pro forma.  *See* ECF 49-10 at 2l ECF 49-11 at 2; ECF 49-21 at 2.

And, any reliance was unreasonable, because the Sumanths were on notice that the document advanced a rose-colored view of their prospects.  When Evolve Bank rejected defendants' loan application on or about March 24, 2014, the Sumanths were not left in the dark as to why.  Mr. Ruiz told the Sumanths that opening a childcare center in Cedar Park would be a "challenge" because the market was "oversaturated."  ECF 72-16 at 2.  And, Mr. Ruiz showed his homework, sending Ms. Sumanth the bank's analysis.  Significantly, this all transpired before defendants obtained a loan from Square 1 Bank.  Hence, when the Sumanths sent the pro forma to Square 1 Bank they had already been presented with evidence that undermined the accuracy of their pro forma.  It follows that defendants' blind faith in the accuracy of their pro forma was not reasonable.  *See Gross*, 332 Md. at 269, 630 A.2d 1167 (observing that reliance without investigation is unreasonable when a party to a contract discovers something that "'should serve as a warning that he is being deceived'") (citation omitted); *see Kiddie Acad. Domestic Franchising LLC v. Faith Enters. DC, LLC*, 2009 WL 2169060, at *5-6 (D. Md. July 17, 2009) (granting summary judgment on negligent misrepresentation counterclaim because  reliance on statement that pro forma "looks okay to me" was unreasonable given conflicting tax documents).

Finally, defendants' contentions surrounding the construction process do not create a genuine issue of material fact as to their negligent misrepresentation claim.  The only evidence in the record that supports defendants' assertion that Kiddie Academy engaged in wrongful conduct in connection with the construction of defendants' childcare center is the Sumanth Affidavit and the Conley Affidavit.  Ms. Sumanth maintains that  Kiddie Academy made "numerous mistakes"

and "significant errors" during the construction process.  ECF 58-2, ¶¶ 21, 29.  According to Ms. Sumanth, "a person or persons familiar with the construction of child care and early childhood education centers . . . should have known about and not made" these mistakes. *Id.* ¶ 21.  Ms. Conley likewise attests that cost overruns incurred in the construction of defendants' center were Kiddie's fault.  ECF 58-17, ¶ 16.  For example, she avers that Kiddie "approved walls in Wonder World's Kiddie Academy child care center that were built incorrectly," *id.* ¶ 18, and "underestimated the cost of constructing a 'splash pad' for Wonder World." *Id.* ¶ 19.

There is no basis, however, to conclude that Ms. Sumanth and Ms. Conley are competent to opine about the construction of a childcare center.  Fed. R. Civ. P. 56(c)(4); *see Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (stating that Rule 56 requires that "affidavits submitted on summary judgment contain admissible evidence").   Thus, these statements merit no weight.

Equally problematic, the mistakes that Ms. Sumanth and Ms. Conley identify, such as failing to budget for a splash pad or overlooking certain permitting requirements, are not false statements, but are instead errors of omission.   An omission gives rise to a negligent misrepresentation claim only in the narrow band of cases where the defendant was "not silent, but rather affirmatively represented only part of the truth."  *Lubore v. RPM Assocs., Inc.*, 109 Md. App. 312, 342, 674 A.2d 547, 561 (1996).  Put differently, the defendant must have "negligently misrepresented the truth by affirmatively representing only a fragment of the entire picture." *Id.* at 331, 674 A.2d at 556.  This is not such a case.  Defendants accuses Kiddie of underestimating the cost of a splashpad and failing to inform defendants of certain licensing requirements.  ECF 58-2, ¶¶ 31-32.  Notably, they do not contend that Kiddie provided defendants with incomplete information or prevented defendants from understanding the full costs of constructing a childcare

48

center.  Thus, to the extent that defendants' counterclaim is premised on the construction of their center, it does not survive summary judgment.

In my prior Memorandum Opinion, I explained that defendants, at bottom, "allege 'a business deal gone bad,'" but that an "unsuccessful business venture, without more, does not state a claim for fraud."  ECF 33 at 35 (citation omitted).  Now, with all the cards on the table, it turns out the same can be said of defendants' negligent misrepresentation claim.  Therefore, because the record is devoid of any facts tending to support defendants' claim that Kiddie uttered a false statement that could have, and did in fact, trigger justifiable reliance, there are no genuine disputes of material fact concerning defendants' negligent misrepresentation claim.  Accordingly, I shall grant the Kiddie S.J. Motion.

### C.  The Frick Motion & the Steelman Motion

In my Memorandum Opinion of November 15, 2019, I granted defendants leave to amend their counterclaim to pursue claims against Mr. Frick and Ms. Steelman.  I observed that defendants "sufficiently allege that Frick and Steelman made false statements to defendants that were likely to induce reliance and which, in fact, harmed defendants."  ECF 63 at 32.  Specifically, "Frick allegedly misled defendants regarding the quality of the analysis performed by Evolve Bank, which led them to continue pursuing a loan to start their franchise," and "Steelman allegedly provided defendants with inaccurate pro formas that defendants used to obtain the loan franchise."  *Id.*

Although these allegations were sufficient to state a plausible claim for negligent misrepresentation at the pleading stage, more is needed to survive summary judgment.  At this juncture, defendants, as the nonmoving parties, must point to facts in the record; mere assertions do not suffice.  However, as explained above, defendants have not carried their

burden of showing that there is a genuine dispute of material fact that Mr. Frick misled them on March 24, 2014. Mr. Frick's email expresses his subjective belief that Evolve Bank did not do "very good" research and therefore it is a quintessential opinion, as opposed to a false statement of fact. And, in any event, defendants did not rely on Mr. Frick's assessment of Evolve Bank, having independently adopted a dim view of the bank's analysis.

Nor is there a live dispute that Ms. Steelman misled the Sumanths with regard to the pro formas. Not only are the pro formas future projections, but defendants' reliance on the pro formas was not reasonable in light of Evolve Bank's critical analysis and their own role in the preparation of them. Defendants also allege that Ms. Conley, not Ms. Steelman, assisted them in crafting the pro forma that was utilized to obtain the loan from Square 1 Bank. *See* ECF 40-2, ¶ 49 ("Using the pro formas as prepared with the assistance of and at the direction of Lisa Conley . . . Supriya and Sumanth's loan application was approved on or about April 17, 2014.). Thus, putting aside the insurmountable problems identified above, Ms. Steelman cannot be blamed as the cause of any damages that can be traced to the pro forma of April 2014.

Accordingly, Mr. Frick and Ms. Steelman are entitled to summary judgment.

## VI.       Conclusion

For the forgoing reasons, I shall grant the J.P. Motion (ECF 50) in part and deny it in part. And, I shall grant plaintiff's S.J. Motion (ECF 49), the Frick Motion (ECF 72), and the Steelman Motion (ECF 73). Further, I shall grant the Motion to Supplement (ECF 90) in part and deny it in part. And, I shall deny the Motion to Reconsider (ECF 91).

An Order consistent with this Memorandum Opinion follows.

Date:   July 27, 2020                                                  _____/s/_____
                                                                       Ellen Lipton Hollander
                                                                       United States District Judge

50